576

ARLINGTON PARK JOCKEY CLUB,
Inc.,

v.

Ernest J. SAUBER, District Director of
Internal Revenue.

WASHINGTON PARK JOCKEY CLUB,
a corporation,

v.

Ernest J. SAUBER, District Director of
Internal Revenue.

Nos. 54 C 171, 54 C 172.

United States District Court
N. D. Illinois.

June 27, 1958.

Leo J. Schwartz and William J. Friedman, Chicago, Ill., for plaintiffs.

Robert Tieken, U. S. Atty., Donald S. Lowitz, Asst. U. S. Atty., Chicago, Ill., and Charles K. Rice, Asst. Atty. Gen., James P. Garland and William F. Kolbe, Attys., Department of Justice, Washington, D. C., for defendant.

JULIUS J. HOFFMAN, District Judge.

These two cases were consolidated for trial. In Civil Action No. 54 C 171, the

plaintiff, Arlington Park Jockey Club, Inc., seeks from the Government the recovery of $102,972.68 of corporate income taxes and interest paid for the fiscal year ended April 30, 1949, and, in addition, interest until repayment is made. In Civil Action No. 54 C 172, the plaintiff, Washington Park Jockey Club, a corporation, seeks from the Government the recovery of $105,110.37 of corporate income taxes and interest paid for the calendar year 1948, and, in addition, interest until repayment is made.

Each of the plaintiff corporations owned $10,000 of the issued $20,000 of the stock of a subsidiary, and the question for decision is whether the plaintiffs may deduct as a bad debt the sum of $227,225.71 which each advanced to the subsidiary within the first fourteen months after its incorporation in a futile effort to insure the success of the subsidiary as a self-sustaining business.

The Commissioner of Internal Revenue disallowed the deduction as a bad debt in the case of each plaintiff and, instead, treated the amounts advanced by the plaintiffs as contributions to capital and therefore deductible only as long term capital losses.

The losses sustained by the plaintiffs were the result of their efforts to make a successful professional football team of the Los Angeles Dons, which operated under a Los Angeles football franchise in the All America Football Conference. Prior to the time that the plaintiffs became financially interested in the Los Angeles Dons the team was owned and operated by Southern California Sports, Inc., which was incorporated under the laws of the State of California on December 20, 1946. Benjamin F. Lindheimer, who was the Executive Director of both plaintiff corporations, was instrumental in organizing the Southern California Sports, Inc., and in securing from the All America Football Conference a franchise for the Los Angeles Dons. Lindheimer was the largest single stockholder in the Southern California Sports, Inc., owning 3,000 shares of its stock having a face value of $30,000, as well as a substantial amount of its debentures. Lindheimer also advanced $270,000 to Southern California Sports, Inc., without receiving therefor any note or other evidence of indebtedness. None of the $270,000 of advances was ever repaid to Lindheimer.

During 1946, the first football season, the Los Angeles Dons were not successful either as a football team or financially. The Southern California Sports, Inc., spent $174,000 hiring and training the Los Angeles Dons for the 1947 season. Prior to the first game of this season, the plaintiffs agreed to and did purchase the Los Angeles Dons from Southern California Sports, Inc., for the price of $10,000. In addition to his position with the plaintiffs, Lindheimer was Chairman of the Executive Committee of the All America Football Conference. Although the Los Angeles Dons had not yet "jelled" as a successful team, Lindheimer was optimistic about the team's future.

Lindheimer testified that if a team could be put together which played good football, and hence would be successful, the franchise would in his judgment be worth between a million and a million and half dollars.

When the plaintiffs agreed to purchase the Los Angeles Dons it was determined that instead of owning the team outright the plaintiffs would cause a new California corporation, to be known as the Los Angeles Dons, Inc., to be formed to take over the team. The sole purpose for organizing a local corporation was to avoid any prejudice which might result from the fact that each of the plaintiffs was an Illinois corporation. Since the Los Angeles Dons was operating under a Los Angeles football franchise it was believed important "to give the club local color and retain the support of Los Angeles area football fans." Don Ameche, who had been president of Southern California Sports, Inc., became president of the new corporation which bore the name Los Angeles Dons, Inc. Similarly, Norman Church and Lloyd Wright became directors of the new

corporation in the interests of giving it local color. In his deposition Don Ameche disclaimed any knowledge that the franchize of the Los Angeles Dons had ever been transferred from Southern California Sports, Inc., to the Los Angeles Dons, Inc., describing his role in the whole matter as entirely "passive."

Preceding the completion of the transfer of the Los Angeles Dons, Lindheimer discussed and received permission from Admiral H. Ingram, who was then Commissioner of the All America Football Conference, to make the proposed transfer. Before securing approval from the Conference for the transfer, Lindheimer assured Admiral Ingram that the plaintiffs would pay all the business obligations of the Los Angeles Dons, without regard to the fact that a separate California corporation was to be organized to own the team.

The plaintiff corporations each held a special meeting of its board of directors on August 28, 1947, at which it was agreed that the two corporations would jointly purchase the Los Angeles Dons from the Southern California Sports, Inc., for $10,000 and then transfer the team to a new California corporation, together with $210,000 of cash in return for which each of the plaintiffs would receive 100 shares of stock in the new California corporation together with an unsecured demand note for $100,000 bearing 2½% interest. The reason for the advances made by each plaintiff was explained in the minutes of the meetings of the respective boards of directors as follows:

"It was further reported that if said offer [of the Southern California Sports, Inc. to sell the Los Angeles Dons] was favorably acted upon by Arlington Park and Washington Park, it would be necessary for each corporation to invest $10,000 as capital and to advance, in order to enable the corporation to function for the current season, an additional $100,000. Whether the 1947 season would result in a financial profit or loss depended to a great part on the success of the football team, and in considering whether such investment should be made the directors should contemplate the possibility of an operating loss in 1947 of anywhere from $50,000 to $150,000. In such event, of course, the advances of $100,000 by each corporation could not be repaid at the end of the current season, but would depend on the future success of the team for ultimate liquidation."

At the time of the transfer the Los Angeles Dons had an annual payroll of $332,586.92 for salaries to coaches, members of the team, and other necessary personnel. In purchasing the Los Angeles Dons the plaintiffs were securing only the franchise, together with contracts which had been entered into with coaches, team members, personnel and for games scheduled for the ensuing season. The Los Angeles Dons, as of August 29, 1947, suffered an aggregate operating loss of $406,113.12.

The proposed transfer was carried out as planned. The Los Angeles Dons, Inc., was organized under the laws of California, and the franchise transferred to it. The Los Angeles Dons continued to lose money through the ensuing fourteen months. In addition to the sum of $20,000 paid by the plaintiffs for stock and the advancement of $200,000 on demand notes on September 2, 1947, the plaintiff Washington Park advanced to the Los Angeles Dons, Inc., the additional sum of $100,000 on March 5, 1948, and the plaintiff Arlington Park advanced the further sum of $100,000 in two installments, one of $50,000 on June 10, 1948, and another of $50,000 on September 8, 1948. These advances of $200,000 were not evidenced by notes and bore no interest. Both the original advancement of $200,000 on September 2, 1947, and the subsequent amount of $200,000 advanced in March, June and September, 1948, were used to meet operating expenses of the Los Angeles Dons.

On October 18, 1848, a partnership formed by Lindheimer and members of his family purchased from the Los Angeles Dons, Inc., for the sum of $39,970.25,

the franchise of the Los Angeles Dons, together with all other assets of Los Angeles Dons, Inc., exclusive of cash and certain accounts receivable. As a condition of the sale, the Los Angeles Dons, Inc., agreed to pay and satisfy all current liabilities accrued prior to October 18, 1948. In order to enable the Los Angeles Dons, Inc., to fulfill the latter obligation, the plaintiffs each advanced $25,000 to the Los Angeles Dons, Inc., on October 20, 1948, and each made an additional advance of $2,500 on December 20, 1948. These advances were not evidenced by notes and did not bear interest. As in the case of each of the other advances, the entries on the books of both the lending corporation and the borrowing corporation treated the advances as loans.

With the advances made by the plaintiffs, the Los Angeles Dons, Inc., paid off all its liabilities other than its indebtness to the plaintiffs, and dissolved in December, 1948. On the dissolution, each of the plaintiffs recovered $274.29.

In its income tax return for the calendar year 1948, Washington deducted as a bad debt the loss of $227,225.71 which it sustained in December, 1948, when the Los Angeles Dons, Inc., dissolved with a payment of only $274.29 on the $227,500 which Washington had advanced to that corporation. Similarly, in its income tax return for the fiscal year ended April 30, 1949, Arlington deducted as a bad debt the loss of $227,225.71 which it sustained in December, 1948, when the Los Angeles Dons, Inc., dissolved with a payment of only $274.29 on the $227,500 which Arlington had advanced to that corporation.

In auditing the return of Arlington for the fiscal year ended April 30, 1949, and the return of Washington for the calendar year 1948, the Commissioner of Internal Revenue disallowed the bad debt deduction of $227,225.71 and determined that the amount was deductible only as a long term capital loss. Each of the plaintiffs paid the resulting deficiency assessed against it, and thereafter filed with the District Director of

Internal Revenue at Chicago a claim for refund predicated on the ground that the Commissioner erroneously disallowed the deduction of $227,225.71, asserting that the amount was deductible as a bad debt under Section 23(k) of the Internal Revenue Code, 1939, or alternately, as an ordinary loss under Section 23(f) of the Internal Revenue Code, 1939, 26 U.S. C.A. § 23(f, k).

The applicable statutory language is:

"§ 23. Deductions from gross income. In computing net income there shall be allowed as deductions:

\* \* \* \* \* \*

"(f) Losses by corporation. In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.

\* \* \* \* \* \*

"(k) Bad debts.

"(l) General rule. Debts which become worthless within the taxable year; \* \* \*".

In applying the foregoing statutory provisions to the facts in the cases at bar, the guiding principle is that stated by the Supreme Court of the United States in Commissioner of Internal Revenue v. Court Holding Co., 1945, 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981:

"\* \* \* The incidence of taxation depends upon the substance of a transaction. \* \* \* To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress."

■ The plaintiffs had the burden of establishing the claimed deduction. White v. United States, 1938, 305 U.S. 281, 292, 59 S.Ct. 179, 83 L.Ed. 172; Matthiessen v. Commissioner, 2 Cir., 1952, 194 F.2d 659, 661; Bair v. Commissioner, 2 Cir., 1952, 199 F.2d 589, 591; Brinker v. United States, D.C.N.D. Cal.S.D.1953, 116 F.Supp. 294, 298. Various factors have been considered by

the courts in deciding whether an advance to a corporation by stockholders constituted a loan or a capital contribution for purposes of the federal taxing statutes. The test most favorable to the taxpayer, of all the formulations of governing principles asserted in the cases, appears to be that recently phrased by Judge Learned Hand in his dissenting opinion in Gilbert v. Commissioner, 2 Cir., 1957, 248 F.2d 399, 412, as follows:

"* * * When the petitioners decided to make their advances in the form of debts, rather than of capital advances, did they suppose that the difference would appreciably affect their beneficial interests in the venture, other than taxwise?"

In the instant case, the plaintiffs have failed to establish that they "supposed" that their beneficial interests in the Los Angeles Dons, Inc., would have been any different in any practical respect, except taxwise, if they had placed their entire $475,000 investment in stock rather than only $20,000 in the form of stock and the remaining $455,000 in the form of loans. Prior to incorporation of the Los Angeles Dons, Inc., the plaintiffs had committed themselves to place at the risk of the venture, and subordinate to the claims of all creditors, all the funds which should be needed to operate the football team during whatever period the franchise remained in the hands of the contemplated new corporation. This was part of the arrangement made in order to secure authority from the All America Football Conference to the proposed transfer of the ownership of the franchise of the Los Angeles Dons from the Southern California Sports, Inc., to the plaintiffs. Indeed, the evidence indicates that the only reason which prevented the plaintiffs from operating the Los Angeles Dons without organizing a new corporation was the fear their Illinois locale would harm the team in a way which could be avoided by operating through a new corporation organized in California and having prominent residents of California as its officers and directors.

When the plaintiffs committed themselves to meet all the business obligations incurred by the Los Angeles Dons, Inc., they were fully aware that this might entail an investment on their part of more than $400,000 within the first year. At that time the Los Angeles Dons had an annual payroll of $332,586.-92. The normal expenses of the team, aside from payroll, included substantial sums for transportation, hotels, advertising and outlays for public relations.

In return for this sizeable investment the plaintiffs foresaw, what seemed to them, a reasonable prospect that the franchise of the Los Angeles Dons would be worth a million or a million and a half dollars, with an annual net income of $100,000 to $150,000, as soon as they could organize a team that played good football. The creation of a successful football team that caught the public fancy did not seem too difficult an undertaking. The witnesses appearing on behalf of the plaintiffs testified to having known of financial successes in the sports world which afforded the basis for their optimism.

The determination of what portion of the initial outlay of $200,000 by the plaintiffs should take the form of stock and what portion the form of a debt seems to have been made by the lawyers and accountants. Repeatedly during the testimony the witnesses showed that they made no distinction between the stock and the debt. For instance Benjamin Lindheimer, who was the chief mover in this matter for both plaintiffs, could not recall when asked on direct examination as a witness for the plaintiff corporations the amount invested in the stock of the Los Angeles Dons, Inc. Throughout his direct examination Mr. Lindheimer testified at length and in minute detail as to dates and figures. In no other instances during his direct examination did he fail to recall the answer to any question asked. In making this observation, no adverse reflection on Mr. Lindheimer is intended. Rather, his integrity and honesty in his testimony establishes that he did not distinguish

between that part of the investment which his lawyers and accountants dressed up as stock and that which they colored as a loan. Mr. Lindheimer did not suppose that it made any practical difference how the investment was labelled. And in fact, because of the legal commitment to place at the risk of the business and subordinate to creditors all the funds needed this dichotomy in form between stock and loan made no difference, except possibly taxwise.

In this regard compare the reasoning followed by the Tax Court in Isidor Dobkin, 15 T.C. 31, 34, affirmed per curiam, 2 Cir., 1951, 192 F.2d 392, where the Tax Court stated:

"* * * Petitioner's own testimony supports the conclusion that the division of his contribution into two portions, capital stock and loan, was merely a bookkeeping transaction. On cross-examination, he admitted that he had no knowledge of how many shares the $500 recorded on the corporate books as his capital stock represented, nor could he state whether the stock had a par value or was no par stock. It is clear that petitioner intended to place at risk the entire $7,000 which he paid in to Huguenot."

The witness other than Mr. Lindheimer called by the plaintiffs during the trial was Clarence Braaten, who at the times here material was the comptroller of both the plaintiff corporations, and a director, vice president and treasurer of the plaintiff Washington and the assistant secretary and assistant treasurer of the plaintiff Arlington. When asked on cross examination what he would consider a fair percentage return on the investment that the plaintiffs made in the Los Angeles Dons he replied that these ventures could be very profitable and bring a return of 6 per cent or 10 per cent or 20 per cent. Subsequent examination indicates that when he made this answer he was thinking not about 6 per cent or 10 per cent or 20 per cent on $10,000 but rather on $200,-000. If the $200,000 was a loan, Mr. Braaten should have thought of it bringing in only the 2½ per cent interest to each corporation on the first $100,000 and no interest at all on the subsequent advances. Again, it appears that he regarded the entire sum advanced as an investment on which the plaintiffs might reap large profits, not as largely a loan, half without any return and the other half with the lowest possible rate of interest.

Judged by the test proposed by Judge Learned Hand in his dissenting opinion in the Gilbert case, 248 F.2d 399, 412, the full $475,000 paid over by the plaintiffs to the Los Angeles Dons must be treated as a capital investment for tax purposes since the plaintiffs failed to show that for any purpose other than taxation they supposed that the $475,000 or any part thereof had any of the advantages or detriments to them of a loan.

The application herein of the test proposed by Judge Learned Hand is not intended as a ruling that this test is the only appropriate criterion for separating capital contributions from loans for tax purposes. The Supreme Court of the United States has stated (John Kelley Co. v. Commissioner, 1946, 326 U.S. 521, 530, 66 S.Ct. 299, 304, 90 L.Ed. 278):

"* * * There is no one characteristic, not even exclusion from management, which can be said to be decisive in the determination of whether the obligations are risk investments in corporations or debts."

Judge Learned Hand's opinion in the Gilbert case is critical of the usual criteria applied by the courts in distinguishing for tax purposes between equity capital and loans. A reading of the numerous decisions of the courts and the almost equally numerous periodical comment, much of it well reasoned and well documented,[1] shows that there has

1. For an excellent collection of cases and articles see Note: Thin Capitalization and Tax Avoidance, 55 Columbia Law Rev. 1054–1066 (November 1955); Ber-

been considerable lack of clarity and consistency in tax decisions in this field. The adoption of Judge Learned Hand's test would remedy in large part the vagueness in the weighing and balancing by the courts of numerous factors, in dividing the stock from the debt. The test would, however, allow many taxpayers to gain a tax advantage not now available to them under most decisions. For, generally, the courts have allowed the Government to deprive taxpayers of the tax advantages of the creditor-debtor relationship between investor and corporation even where the taxpayer could show that the creditor-debtor relationship had other practical differences from equity ownership aside from those relating to taxes.

Traditionally the courts have divided debt and stock by establishing the norms for each and assigning each situation to that norm to which it most nearly approached. So judged, many cases which would escape the tax collector under Judge Learned Hand's test would be taxable under prevailing court decisions, while all cases which the tax collector would catch under Judge Learned Hand's test would be caught under prevailing court decisions. So in the instant case, we know of no test that would result in a decision for the plaintiffs.

The courts have usually contrasted the two opposite norms of equity ownership and debt in language similar to the following used by our Court of Appeals in Commissioner of Internal Revenue v. Meridian & Thirteenth Realty Co., 7 Cir., 1942, 132 F.2d 182, 186:

> " * * * the essential difference between a creditor and a stockholder is that the latter intends to make an investment and take the risks of the venture, while the former seeks a definite obligation, payable in any event."

Similarly, the United States Court of Appeals for the Sixth Circuit stated

nard A. Greenberg and Frederick L. Simmons, The Thin Incorporation Problem: Are the Courts Fighting the Tar Baby,

(United States v. Title Guarantee & Trust Co., 1943, 133 F.2d 990, 993):

> " * * * *The essential difference between a stockholder and a creditor is that the stockholder's intention is to embark upon the corporate adventure, taking the risks of loss attendant upon it, so that he may enjoy the chances of profit.* The creditor, on the other hand, does not intend to take such risks so far as they may be avoided, but merely to lend his capital to others who do intend to take them. Helvering v. Richmond, F. & P. R. Co., 4 Cir., 90 F.2d 971. See Warren v. King, 108 U.S. 389, 399, 2 S.Ct. 789, 27 L.Ed. 769." (Emphasis in the original.)

In Gilbert v. Commissioner, 2 Cir., 1957, 248 F.2d 399, 406–407, the majority of the court, in remanding to the Tax Court for further findings of fact, stated:

> " * * * in determining whether advances to closely held corporations may properly be treated as loans for tax purposes, the courts have stressed one or more of a number of factors, including the debt-equity ratio, the presence of an agreement to maintain proportionality between the advances in question and acknowledged risk capital, the presence of tax avoidance motives, the use to which the funds were put, whether outside investors would make such advances, and lack of reasonable expectation of repayment. These are proper subjects of consideration, for the Congress evidently meant the significant factor to be whether the funds were advanced with reasonable expectations of repayment regardless of the success of the venture or were placed at the risk of the business, and, as we shall show, each of the enumerated items does or may bear on the degree of the risk involved.

5 U.C.L.A.Law Rev. 275–295 (March 1958).

"From the point of view of the corporation, the Code allows a deduction for 'interest paid * * * on indebtedness,' yet it allows no deduction for dividends paid. Thus, where a corporation pays for the use of money which it will return, it is in effect allowed a deduction for a business expense, just as it is allowed a deduction for the expense of renting a building. Where, however, a corporation pays dividends, it is not incurring a business expense; it is distributing profits. While interest and profits are not always distinguishable, they are distinct concepts, and the distinction, however imperfect it may be in a particular case, lies in the degree of risk involved. Thus, it would do violence to the congressional policy to permit an 'interest' deduction where the 'loan' is so risky that it can properly be regarded only as venture capital.

"Similarly, the Congress decreed different treatment for the loss of funds advanced with reasonable expectations of repayment, whether to earn interest or for some other reason, than it did for the loss of funds risked upon the success of a business venture. Here again it would do violence to the congressional policy to allow a bad debt deduction in the case of a loss which is as a matter of substantial economic reality a loss of risk capital.

"The relationship of 'nominal stock investments' or 'an obviously excessive debt structure,' to use the phrases employed by the Supreme Court in John Kelley Co. v. Commissioner, 326 U.S. 521, 526, 66 S.Ct. 299, 302, 90 L.Ed. 278, to the degree of risk involved is clear. Any 'loan' to the corporation in such circumstances would necessarily be venture capital in reality, for any business loss by the corporation would be reflected in an inability to repay the 'loan.'

"An agreement to keep 'loans' proportioned to acknowledged risk capital is indicative that the funds 'loaned' were understood to have been placed at the risk of the business. There is no apparent reason for such an agreement where repayment seems fairly certain. Such an agreement is readily understood, however, where there is real danger that the money might be lost, for by means of such an agreement each stockholder risking additional capital in the form of a 'loan' can be assured that his percentage of the equity and control will remain in correspondence with his shares of the risk. In other words, a reluctance to 'lend' money to the corporation unless his fellow shareholders 'lend' proportionate amounts belies a feeling of confidence that the funds will be returned regardless of the success of the venture. And the shareholder's understanding of the degree of risk involved is of course relevant in determining what is in fact the degree of risk involved."

Judged by the factors mentioned by the majority of the court in the Gilbert case, the decision here must be for the defendant. The witnesses were all agreed that the entire sum of $475,000 advanced by the plaintiffs was at the risk of the venture. They testified that it was understood from the outset of the undertaking that not even the 2½ per cent interest on the $200,000 advanced on demand notes was to be paid unless the Los Angeles Dons was making a profit. The agreement of the plaintiffs to advance funds to meet all of the obligations of the Los Angeles Dons placed all the money so advanced in the category of risk capital. All persons involved understood that until and unless a successful professional football team was created, neither the principal nor the interest on the money could be repaid. By the nature of the arrangement all advances were subordinate to all other creditors and could be recovered only

to the extent that the Los Angeles Dons had net profits. A fixed maturity date or an intention to pay interest as due would only have committed the plaintiffs to advance further funds to the Los Angeles Dons, Inc., to be used in repaying themselves, since the franchise transfer had been conditioned on the plaintiffs undertaking to meet all the obligations of the Los Angeles Dons, Inc. In numerous cases the courts have held that an intention on the part of the so-called lender to place his advance at the risk of the enterprise was a factor establishing that the advance was for tax purposes a contribution to capital rather than a loan. In addition to the Gilbert case, 248 F.2d 399, 406, see Commissioner of Internal Revenue v. Meridian & Thirteenth R. Co., 7 Cir., 1942, 132 F.2d 182, 186; United States v. Title Guarantee & Trust Co., 6 Cir., 1943, 133 F.2d 990, 993; Gooding Amusement Co. v. Commissioner, 6 Cir., 1956, 236 F.2d 159, affirming 23 T.C. 408, 418–419; Matthiessen v. Commissioner, 2 Cir., 1952, 194 F.2d 659, 661–662; Bair v. Commissioner, 2 Cir., 1952, 199 F.2d 589, 591; Isidor Dobkin, 15 T.C. 31, 34, affirmed 2 Cir., 1951, 192 F.2d 392; Martin M. Dittmar, 23 T.C. 789, 796–797.

The highly speculative nature of the business of the Los Angeles Dons, Inc., made it unlikely that anyone not owning stock would invest therein. The witnesses were all agreed that no effort was made to borrow money for the Los Angeles Dons from banks or from any other source. Aside from the funds advanced by the plaintiffs, the Dons had no fund or cushion of equity capital to which any outside lender could have looked for repayment. The advances made by the plaintiffs were in the nature of advances to get the business going. Until a successful professional football team could be put together, the Dons could not be considered a going business enterprise. All contributions by the plaintiffs were intended to be used and were used in an effort to create a successful professional football team. In this sense the advances of the plaintiffs had all the earmarks of capital contributions. They were not to help a going business keep going; they were to get a business enterprise started.

The debt-equity ratio here was greatly disproportionate, beginning at 10:1 and increasing to 22:1, unless the advances were all treated as capital contributions rather than loans. In numerous cases, in addition to the Gilbert case, 248 F.2d 399, 406–407, thin capitalization with an excessive debt structure has been held a factor indicating that for tax purposes the advance was to be treated as a contribution to capital. See Sarkes Tarzian, Inc., v. United States, 7 Cir., 1957, 240 F.2d 467, 470; Matthiessen v. Commissioner, 2 Cir., 1952, 194 F.2d 659, 661; Bair v. Commissioner, 2 Cir, 1952, 199 F.2d 589, 591; Reed v. Commissioner, 2 Cir., 1957, 242 F.2d 334; Brinker v. United States, D.C.N.D.Cal.S.D.1953, 116 F.Supp. 294, 297; Martin M. Dittmar, 23 T.C. 789, 791, 796–797; R. M. Gunn, 25 T.C. 424, 437.

The plaintiffs have argued that the thin capitalization cases are inapplicable here for two reasons: (1) that $20,000 was not a nominal sum, but rather a substantial sum entirely sufficient to purchase the franchise, which was all the capital asset required; and (2) that the franchise had a potential value of a million or a million and a half dollars, so that the debt-equity ratio must be based on the worth of the franchise, not on what the plaintiffs paid for the franchise. What is nominal depends upon the circumstances. A capital structure of $20,000 is nominal for a business venture in which the gross annual payroll alone amounts to $332,586.92, exclusive of other necessary expenses for transportation, lodging and public relations. Nor is there any basis for according the franchise any value in excess of the $10,000 purchase price. The history of the franchise had been solely one of substantial losses. Any value it might sometime have was too conjectural and speculative to stand as a basis for more favorable debt-equity ratio.

The evidence was undisputed that the two plaintiffs had agreed to advance equally the amounts needed to meet all the obligations of the Los Angeles Dons. They each invested $227,500 and each received $10,000 in stock, a $100,000 demand note and $127,500 in amounts due on open accounts. Where stockholders maintain the same proportionate interest in the formal debt structure of a corporation as in its formal stock structure, this is regarded as evidence that the so-called loans are actually contributions to capital. For cases so holding, in addition to the Gilbert case, 248 F.2d 399, 407, see Gooding Amusement Co. v. Commissioner, 6 Cir., 1956, 236 F.2d 159, affirming 23 T.C. 408; Brinker v. United States, D.C.N.D. Cal.S.D.1953, 116 F.Supp. 294, 296; Bair v. Commissioner, 2 Cir., 1952, 199 F.2d 589, 591; Edward G. Janeway, 2 T.C. 197, affirmed 2 Cir., 1945, 147 F.2d 602; 1432 Broadway Corp., 4 T.C. 1158, affirmed 2 Cir., 1947, 160 F.2d 885; R. E. Nelson, 19 T.C. 575, 580; R. M. Gunn, 25 T.C. 424, 437.

Likewise, the subordination of the so-called loan to genuine creditors is a hallmark of an equity contribution. Sarkes Tarzian, Inc., v. United States, 7 Cir., 1957, 240 F.2d 467, 470; Commissioner of Internal Revenue v. Meridian & Thirteenth R. Co., 7 Cir., 1942, 132 F.2d 182, 185, note 5; Reed v. Commissioner, 2 Cir., 1957, 242 F.2d 334; Watson v. Commissioner, 2 Cir., 1942, 124 F.2d 437, 440; Gooding Amusement Co. v. Commissioner, 6 Cir., 1956, 236 F.2d 159, affirming 23 T.C. 408, 419; Wetterau Grocer Co. v. Commissioner, 8 Cir., 1950, 179 F.2d 158, 160; Martin M. Dittmar, 23 T.C. 789, 797.

The court finds that the aggregate amount of $475,000 advanced to the Los Angeles Dons, Inc., by the plaintiffs represented contributions to capital and that no part of it constituted a loan. It is ordered, therefore, that judgment be and it hereby is entered in favor of the defendant in each case and against the plaintiffs, Arlington Park Jockey Club, Inc., and Washington Park Jockey Club, a corporation, with costs taxed against the plaintiffs.

To satisfy the requirements of Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., the findings of fact and conclusions of law of the court appear in the foregoing memorandum of decision.