Brighton Recreations, Incorporated, a Utah corporation v. Commissioner.
Brighton Recreations, Inc. v. Commissioner
Docket No. 72172.
United States Tax Court
T.C. Memo 1961-29; 1961 Tax Ct. Memo LEXIS 325; 20 T.C.M. (CCH) 127; T.C.M. (RIA) 61029; January 31, 1961
Arthur H. Nielsen, Esq., Newhouse Bldg., Salt Lake City, Utah, for the petitioner. Norman H. McNeil, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined a deficiency in petitioner's income tax for the fiscal year ending September 30, 1954 in the amount of $3,060.24. The issues are: (1) whether payments on debentures to petitioner's shareholders represented deductible interest; (2) whether, in disallowing a portion of petitioner's depreciation deduction for a chair ski-lift respondent properly recomputed the asset's cost basis and useful life; (3) whether petitioner is entitled *326 to a net operating loss deduction based on carry-overs, if any, from fiscal 1952 and fiscal 1953. Findings of Fact The stipulated facts are found. Petitioner is a Utah corporation with its principal office at Salt Lake City. It filed its return for fiscal 1954 on an accrual method of accounting with the director of internal revenue for the district of Utah. Issue No. 1 - Interest Deduction For approximately 3 years prior to 1947, Leonard A. Brennan, sometimes hereinafter called Brennan, studied and planned the establishment of a chair ski-lift for profit on Mount Millicent at Brighton, near Salt Lake City, Utah. Under date of June 1, 1947, Brennan, on behalf of petitioner, accepted a permit [1] or lease from the United States Department of Agriculture on a portion of the Wasatch National Forest at Brighton for the purpose of constructing a ski-lift. Brennan had this site surveyed and drawings prepared. He obtained commitments from various construction companies. Sometime during the early part of 1947, Brennan contacted several business and professional men regarding investment in a venture *327 to construct and operate a ski-lift at Brighton. These men, including Brennan, will sometimes hereinafter be called the group. At that time there was no comparable ski-lift in operation at or near Salt Lake City. The group determined that the corporate form of doing business would be appropriate because of the limited liability aspect. It recognized that the operation of a ski-lift involved a sizable risk and that approximately $120,000 would be required for construction. However, the group was not willing to advance $120,000 to construct the ski-lift. It agreed to place $20,000 into the capital structure of a corporation and advised Brennan to seek any type of outside financing for the balance of the money necessary for construction. On or about May 17, 1947, the incorporators of petitioner executed its Articles of Incorporation, subscribed to and paid for 10 per cent of its $20,000 authorized capital stock (4,000 shares at $5 par value) and forwarded the Articles to Utah's secretary of state. There was stamped on the Articles the following: "Received May 26, 1947 * * * Secretary of State." The incorporators, shares subscribed and amounts were as follows: Shares
Amount
Leland H. Stevens
80
$ 400
Dr. Guy Wight
80
400
Ralph Reid
80
400
Robert Schubach
80
400
Leonard A. Brennan
80
400
400
$2,000
*328 Petitioner's Articles of Incorporation stated in part: The affairs and business of the corporation shall be controlled and managed by the Board of Directors which have power without action of confirmation by the stockholders to acquire or dispose of property, real and personal by agreement, franchise, lease, sale, purchase or otherwise, and to borrow money and to assign, transfer, pledge, mortgage or otherwise encumber all or any part of the property and assets of the corporation as securities for the repayment thereof and on such terms and conditions and for such purposes as the board of directors may from time to time determine; and to create a bonded indebtedness, to issue promissory notes, debentures, or other evidences of indebtedness secured or unsecured, on all or any part of the property of the corporation. * * * On May 26, 1947, petitioner qualified as a Utah corporation. One of the main purposes of petitioner was to engage in the business of providing recreational facilities in the resort area known as Brighton. On May 28 and June 10, 1947, petitioner's board of directors held its first two meetings. During these meetings the directors discussed, among other things, *329 the matter of financing the construction of the proposed ski-lift. The minutes of the May 28 meeting stated, in part: [(1)] Dr. Wight * * * stated that it was his information that subscriptions have been entered into covering substantially the entire capital stock of the corporation * * * [as follows: Leonard A. Brennan- $963; Walter E. Cosgriff-$4,465; Owen Covey-$1,926; Arthur Johansen- $262; Harold Kimball- $175; Ralph Reid-$1,926; James Robinson- $875; Robert Schubach- $963; William Schubach, Jr.- $963; J. Kay Smith- $350; Leland H. Stevens-$1,926; William H. Westphal- $963; and Dr. Guy Wight-$2,101.] * * * Thereupon * * * the following resolution was unanimously approved and adopted: [(2)] RESOLVED: that the subscription agreements be, and they are hereby ratified, approved and adopted by the corporation; and that upon receipt of payment in full therefor by the Treasurer acting for and on behalf of the corporation, the President and Secretary are authorized to execute and deliver certificates of common stock of the corporation to the individuals listed in the appropriate amount of shares. * * *
[(3)] Mr. Brennan * * * advised the Board it would be possible *330 to construct a proper [ski] lift * * * [for approximately] $115,000 * * *. He presented actuary charts to substantiate the possibility of the lift's proposed profitableness to the corporation * * *. [(4)] [The] Board considered the advisability of the corporation's construction of the proposed lift and the ways and means of raising the necessary finances which would be required. It was pointed out by Mr. Cosgriff that the capital of the corporation upon the issuances of its common stock would amount to approximately $20,000 and an additional $95,000 would be required as a minimum. [The possibilities of securing loans from interested parties and the subscribing stockholders was considered.] * * * [The] following resolution was * * * unanimously adopted by the Board: [(5)] RESOLVED: that the corporation raise the necessary funds for the construction of the ski-lift and minimum facilities on Mount Millicent at Brighton through loans and the issuance of [10-year] [debentures] thereon by the corporation, said debentures bonds to bear interest at the rate of five per centum (5%) per annum * * * [but petitioner's financial position to warrant deferment of interest payments, *331 under certain conditions; and claims of debentureholders to be subordinate to those of general creditors and superior to those of shareholders.] [(6)] It was the consensus of the Board and the Stockholders present that if possible loans for the corporation should be secured from the subscribing stockholders. * * * Dr. Wight stated that he would loan the corporation $9,898.44 in the event and conditioned upon the remaining subscribers and stockholders loaning the corporation comparable funds based on their amount of stock as compared to his. * * * Whereupon the following resolution was * * * unanimously adopted by the Board: RESOLVED: that in the event the subscribing stockholders of record offer to loan the corporation funds with which to construct a ski-lift and facilities on Mount Millicent, the amount of each loan to be determined by ratio of the amount of stock owned by Dr. Guy Wight and the sum of $9,898.44 as to the amount of stock owned by the other subscribers or stockholders, then in such event the corporate officers * * * [be] and they are hereby authorized to borrow money and issue debenture bonds therefor * * * [as follows: Leonard A. Brennan-$4,536; Walter E. *332 Cosgriff-$21,034; Owen Covey-$9,073; Arthur Johansen-$1,237; Harold Kimball- $824; Ralph Reid-$9,073; James Robinson-$4,124; Robert Schubach-$4,536; William Schubach, Jr.-$4,536; J. Kay Smith-$1,649; Leland H. Stevens-$9,073; William H. Westphal-$4,536; and Dr. Guy Wight-$9,898.] [(7)] * * * [The] following motion was * * * approved by the Board: RESOLVED: that the corporation assume as a company expenditure cash outlays by Mr. Brennan amounting to $2,136.59 and that it be agreed and determined that the sum of $10,063.41 is a reasonable and true value for the plans, drawings, preparations, commitments and promotions secured and held by Mr. Brennan to date; and that the corporation through its authorized officers, issue capital stock amounting to $2,136.59 and debentures amounting to $10,063.41 to Mr. Brennan in payment for his activities and services and in compensation for expenditures and cash outlays to date. * * *
[(8)] * * * [The] following resolution was unanimously adopted by the Board: RESOLVED: that [petitioner] hereby approves, ratifies and adopts any commitments, agreements, contracts or memorandums of contract made and entered into by Mr. Brennan *333 for the design and construction of a ski-lift on Mount Millicent in the Brighton area; and be it further resolved that the proper officers of this corporation, be and they are hereby authorized to executed and enter into contracts with the Columbia Steel Company for the construction of machines, chairs, ropes and fittings at a contract price of $63,846, and to enter into a contract with the Frank N. Ellis Company for detail of all towers and terminal stations, fabricate and furnish steel, and erection and installation of concrete piers and towers at a contract price of $30,000, plus $40 for each cubic yard of concrete in place in excess of 80 cubic yards. At the June 10, 1947 meeting of petitioner's directors, Brennan stated that his efforts to secure outside loans for construction of the ski-lift were unsuccessful. Lending institutions were reluctant to extend funds because the true cost could not be measured. Reconstruction Finance Corporation was not interested until financial possibilities could be determined with certainty. An additional problem was that the facilities would be constructed on leased property. Among other things, and with a few minor exceptions, the minutes *334 of the June 10 meeting repeated paragraphs "[(5)] through [(8)]" of the minutes of the May 28 meeting. Thereupon, and shortly thereafter, petitioner issued debentures to its shareholders, in exchange for the advancement of funds. These debentures stated, in part: This is to certify that [petitioner] hereby acknowledges itself indebted to in the sum of Principal payable November 15, 1957 with interest at the rate of seven per centum (7%) per annum on or before the 15th day of November of each year. It being understood that in the event the financial position of [petitioner] should not warrant the payment of interest on any interest due date it shall have a period of three (3) years from the date of interest payment as due to make payment thereof; however, the continued deferment in the payment of interest for a period of more than three years shall cause the principal of this debenture to become immediately due and collectible. It is expressly understood and agreed that all creditors other than stockholders of the corporation shall rank first in right and their claims shall be superior to the holder of this and other corporation debentures but all holders of debentures *335 shall rank and their claims shall be equal in right with each other and superior to the stockholders of the corporation with respect to their shares. An analysis of petitioner's "Debenture Bond Ledger" indicated the name of the debentureholder, date of issue and amount of debentures, as follows (in even dollars): Date
Amount
Debenture holder
Issued
Issued
Jack M. Ahearn
5/ 8/47
$ 2,970
Brennan Enterprises
5/ 8/47
6,155
10/ 7/47
2,050
3/ 3/48
2,600
4/17/48
1,900
Enid Cosgriff
10/11/47
3,505
Mrs. J. E. Cosgriff
10/11/47
7,010
Walter Cosgriff
10/11/47
3,505
Owen and Ruth Covey
5/ 8/47
9,075
Arthur Johansen
5/ 8/47
1,730
Harold Kimball
5/ 8/47
325
11/29/47
500
Ralph and Margaret Reid
5/ 8/47
1,000
8/ 7/47
1,075
11/13/47
2,500
2/ 7/48
4,000
5/19/48
500
James and Helen Robinson
5/ 8/47
1,625
11/13/47
2,500
William Schubach, Jr.
5/ 8/47
1,785
12/29/47
2,750
Robert Schubach
5/ 8/47
1,785
11/29/47
2,750
J. K. and Anne Smith
5/ 8/47
125
12/29/47
4,000
Leland H. Stevens
5/ 8/47
3,575
11/15/47
5,500
Marion C. Sturdevant
3/ 3/48
4,535
William H. Westphal
5/ 8/47
2,970
Dr. Guy H. and Florence
Wight
5/ 8/47
3,200
5/18/47
2,700
10/ 7/47
4,000
Total Debentures Issued
$94,200
*336 A comparison of petitioner's original debentureholders and stockholders subsequent to incorporation with those individuals referred to in the minutes of the first two meetings of petitioner's board of directors, and the amounts respectively owned or to be owned by each, is as follows (in even dollars): Dollar
Total dol-
Dollar
amount
lar amounts
Total
amount
of de-
of stock and
Dollar
Dollar
dollar
of stock
bentures
debentures
Number
amount
amount
amounts of
referred
referred
referred
of
of
of de-
stock and
to in
to in
to in
shares
stock
bentures
debentures
directors'
directors'
directors'
Name *
issued
issued
issued
issued
minutes
minutes
minutes **
Jack Ahearn
126
$ 630
$ 2,970
$ 3,600
***
***
***
Brennan Enterprises*
539
2,695
12,705
15,400
$ 963
$ 4,536
$ 5,500
Enid Cosgriff
149
745
3,505
4,250
***
***
***
Mrs. J. E. Cosgriff
298
1,490
7,010
8,500
***
***
***
Walter E. Cosgriff
149
745
3,505
4,250
4,465
21,034
25,500
Owen Covey
385
1,925
9,075
11,000
1,926
9,073
11,000
Arthur Johansen
74
370
1,730
2,100
262
1,237
1,500
Harold Kimball
35
175
825
1,000
175
824
1,000
Ralph Reid
385
1,925
9,075
11,000
1,926
9,073
11,000
James Robinson
175
875
4,125
5,000
875
4,124
5,000
William Schubach, Jr.
193
965
4,535
5,500
963
4,536
5,500
Robert Schubach
193
965
4,535
5,500
963
4,536
5,500
J. K. Smith
175
875
4,125
5,000
350
1,649
2,000
Leland H. Stevens
385
1,925
9,075
11,000
1,926
9,073
11,000
Marion C. Sturdevant
193
965
4,535
5,500
***
***
***
William H. Westphal
126
630
2,970
3,600
963
4,536
5,500
Guy H. Wight
420
2,100
9,900
12,000
2,101
9,898
12,000
Totals
4,000
$20,000
$94,200
$114,200
$17,863
$84,136
$102,000
*337 The debentures issued to the shareholders were in proportion to each one's respective stock interest. One of the shareholders determined this to be a proper method since the individuals were going into business together and should take an equal risk in it. The shareholders desired that their loans to petitioner should be on a short-term basis. They understood that these amounts would be repaid by the end of the 10-year period. The shareholders did not discuss tax advantages to petitioner. The incorporators and subscribing shareholders recognized that petitioner's stock would have an uncertain market because the business operation contemplated involved risks. This was the reason advanced by most of the shareholders for accepting debentures instead of additional stock. Of the total dollar amount of debentures and stock issued by petitioner, approximately 82 per cent *338 represented debentures. Of the total dollar amount of these debentures and stock owned by each of petitioner's shareholders, approximately 82 per cent represented debentures. From approximately fiscal 1947 through fiscal 1954, petitioner's stock ledger and debenture-bond ledger, respectively, reflected a number of transfers. The following accounts on petitioner's books, reflecting simultaneous transfers of debentures and stock, were decreased: Account of debenture-
Dollar amount
holder-stockolder
Date of
of deben-
Number of
decreased
transfer
tures
shares
Jack Ahearn
9/ 9/49
$1,650
70
William Schubach, Jr.
Jan. 1951
4,535
193
Leonard A. Brennan
1/22/52
1,650
70
Enid Cosgriff
1/22/52
3,505
149
Mrs. J. E. Cosgriff
1/22/52
7,010
298
Walter Cosgriff
1/22/52
3,505
149
Marion C. Sturdevant
1/22/52
4,535
193
Ralph (and Margaret) Reid
6/16/52
9,075
385
Arthur Johansen
11/23/53
1,730
74 The following accounts, including newly created accounts, on petitioner's books, reflecting simultaneous transfers of debentures and stock, were increased: Account of debenture-holder-
Dollar amount
stockholder increased
Date of
of deben-
Number of
(or new account)
transfer
tures
shares
Leonard A. Brennan
9/ 9/49
$ 1,650
70
Guy H. (and Florence) Wight
Jan. 1951
4,535
193
Brennan Enterprises
1/22/52
1,650
70
Guy H. (and Florence) Wight
1/22/52
14,435
613
Guy Eugene Wight
1/22/52
2,060
88
Lee D. Wight
1/22/52
2,060
88
Guy H. (and Florence) Wight
6/16/52
9,075
385
Kirby Dawson
11/23/53
1,730
74
*339 As of September 30, 1954, petitioner's books reflected that Enid Cosgriff, Mrs. J. E. Cosgriff, Walter Cosgriff, Arthur Johansen, Ralph (and Margaret) Reid, William Schubach, Jr., Marion C. Sturdevant and Leonard A. Brennan were no longer stockholder-debentureholders, and that its stockholder-debentureholders, and the amounts owned by each, were as follows: Total dollar
amounts
Number of
Dollar amount
Dollar amount
of debentures
Name of shareholder-
shares
of shares
of debentures
and shares
debentureholder
owned
owned
owned
owned
Jack Ahearn
56
$ 280
$ 1,320
$ 1,600
Brennan Enterprises
609
3,045
14,355
17,400
Owen (and Ruth) Covey
385
1,925
9,075
11,000
Kirby S. (and Eleanor) Dawson
74
370
1,730
2,100
Harold (and Jane) Kimball
35
175
825
1,000
James (and Helen) Robinson
175
875
4,125
5,000
Robert Schubach
193
965
4,535
5,500
J. K. (and Anne) Smith
175
875
4,125
5,000
Leland H. Stevens
385
1,925
9,075
11,000
William H. Westphal
126
630
2,970
3,600
Guy H. (and Florence) Wight
1,611
8,055
37,945
46,000
Guy Eugene Wight
88
440
2,060
2,500
Lee Davis Wight
88
440
2,060
2,500
Totals
4,000
$20,000
$94,200
$114,200
*340 Petitioner's Articles of Incorporation did not require that the debentures and stock be sold or transferred together in the event of a sale. In each instance when an individual partially or completely withdrew from petitioner prior to December 10, 1957, he sold both his stock and debentures to one of petitioner's remaining shareholder-debentureholders or a new investor, in the same percentage proportion that the stock and debentures, in the aggregate, were issued originally. Subsequent to December 10, 1957, certain debentures were retired or transferred independently of the sale or transfer of the same holder's stock. Prior to December 10, 1957, new investors in petitioner did not acquire its stock without acquiring debentures. On or about this time petitioner's outstanding stock and dollar amount of debentures issued were 4,000 shares and $94,200, respectively. Petitioner had not redeemed any of the issued debentures nor had it made any actual provision for redemption. On November 15, 1957, petitioner's debentures matured. Petitioner failed to pay the principal amounts due. On December 13, 1957, debentureholder Robert M. Schubach, hereinafter called Schubach, commenced an *341 action in a Utah court against petitioner to recover the principal amounts on his debentures. Petitioner filed a general denial. At or about this time petitioner's attorney knew of respondent's investigation which was to give rise to this part of the present Tax Court proceeding. On February 19, 1958, at a hearing on Schubach's motion for summary judgment, with petitioner neither represented by its officers nor counsel, the Utah court granted the motion and entered, inter alia, judgment against petitioner for the principal amounts of the matured debentures. On the same day, petitioner satisfied this judgment. Sometime during the latter part of 1957 or early part of 1958, petitioner's attorney found no reason to challenge Schubach's complaint in light of respondent's position. At the time Schubach brought this action he had no knowledge that respondent was investigating the interest deduction reported by petitioner in its fiscal 1954 return. Shortly thereafter, upon demand, petitioner paid debentureholders James F. and Helen Robinson the principal amounts of their debentures. On February 10, 1958, petitioner wrote a letter to its debentureholders, part of which stated: As *342 you are perhaps aware, the bonds which you hold in [petitioner] matured and became due on November 15, 1957. While [petitioner] has an obligation to redeem these bonds at this time it has been felt advisable, insofar as possible, to replace these bonds with new bonds maturing in sequence so that all bonds will be retired, together with accruing interest thereon, within the next ten (10) years. By amortizing payment of the bonds in this manner it will avoid the necessity of taxing the financial resources of your company at this time to pay them off in full. At a special meeting of petitioner's shareholders held on March 18, 1958, a resolution was adopted providing for the issuance of new debentures, designated as notes, to replace the old debentures and for the retirement of this new issue over a 10-year period. The final redemption date was September 30, 1969. Except for Jack M. Ahearn, Owen and Ruth Covey and Leland H. Stevens, the remaining debentureholders complied with the March 18 resolution. Since the reissue of the debentures, interest payments have been made as they have become due. On December 2, 1948, a bank loaned petitioner the sum of $4,000, payable in 4 months. *343 Petitioner repaid this loan plus interest during 1949. Except for this loan and the debentures in issue, petitioner secured no other loans during its existence. Since its inception, petitioner has paid no salaries to its officers. From April 30, 1955 through July 31, 1958, petitioner paid directors' fees as follows: Date
Amount
4-30-55
$ 40
12-31-55
60
8-31-56
30
9-30-57
40
11-30-57
30
7-31-58
120
From March 31, 1950 through September 30, 1957, petitioner paid "interest" on the issued debentures as follows (in even dollars): Total "interest"
computed to -
Amount
Date paid
Nov. 15, 1948
$7,866
Mar. 31, 1950
Nov. 15, 1949
6,594
Jan. 31, 1951
Nov. 15, 1950
6,594
Feb. 28, 1951
Nov. 15, 1951
6,594
Sept. 30, 1951
Nov. 15, 1952
6,594
Sept. 30, 1952
Nov. 15, 1953
6,594
Sept. 30, 1953
Nov. 15, 1954
6,594
Sept. 30, 1954
Nov. 15, 1955
6,594
Sept. 30, 1955
Nov. 15, 1956
6,594
Sept. 30, 1956
Nov. 15, 1957
6,594
Sept. 30, 1957
In its returns for fiscal 1952 through 1954 petitioner reported "interest" deductions in the foregoing respective amounts. On December 10, 1957, respondent mailed petitioner a notice *344 of deficiency in income tax for fiscal 1954 and, among other things, disallowed the reported interest deduction of $6,594. The debentures totaling $94,200 represented loans to petitioner. The amount of $6,594 expended by petitioner in fiscal 1954 constituted interest on indebtedness. Issue No. 2(a) - Depreciation (basis) In connection with the original construction of its ski-lift, petitioner purchased on an open account a substantial portion of the materials, including the steel for the towers, from Columbia Steel Company, hereinafter called Columbia. Columbia had agreed to furnish these materials for $63,846. As of May 25, 1948, a dispute had arisen between Columbia and petitioner regarding payment of $13,363.90. This sum was the balance of the agreed purchase price for the materials furnished and services rendered by Columbia. In a letter to Columbia dated May 25, 1948, petitioner set forth claims amounting to at least $13,352.95 to offset the unpaid balance. Included among the claims was an item designated as "Loss of revenue due to delay in placing the lift in operation… $6,418.25." The remaining claims amounting to $6,934.70 were alleged to be expenditures made *345 by petitioner to rectify claimed errors committed by Columbia and its engineer. According to petitioner's books, the last payment made to Columbia was on December 1, 1948. This left an unpaid balance of $13,363.90 under the original contract. From June 14, 1949 to December 19, 1949, petitioner and Columbia investigated settlement of the balance of the account deemed due by Columbia and the amount claimed by petitioner. In the course of settlement negotiations petitioner had offered to concede one-half of its claim for loss of revenue or $3,209.13, leaving a balance of $10,143.82 still the subject of petitioner's claim. Columbia was willing to concede $2,674.17 for settlement, which would have left an unpaid sum of $6,819.33, according to its books. An exchange of letters between Columbia and petitioner in November and December of 1949 evidenced complete rejection of settlement proposals by both parties. As of December 1949, the books of Columbia and petitioner reflected as unpaid the respective amounts of $9,493.50 and $13,363.90. In 1950 petitioner and Columbia continued negotiations. On or about January 8, 1951, petitioner rejected an offer by Columbia. From May 25, 1948 through *346 fiscal 1950, petitioner depreciated its ski-lift upon a cost basis of $130,071.69. This cost basis included the $63,846 of materials which Columbia agreed to furnish petitioner. The amount of $63,846 included the disputed amount of $13,363.90. In March 1951, Columbia made an allowance to petitioner in the amount of $3,780.29. Petitioner credited its ski-lift account accordingly and reduced its cost basis to $126,291.40. This brought the disputed amount to $9,581.63. This sum was reflected on petitioner's books as the balance remaining unpaid to Columbia. The basis of $126,291.40 employed by petitioner included the sum of $9,581.63. Petitioner never paid the amount of $9,581.63 to Columbia. No action was ever commenced by Columbia to collect this amount. In his notice of deficiency for fiscal 1954, respondent determined that the cost basis of the chair ski-lift was $116,709.77. The cost of the chair ski-lift was $116,709.77 and this constituted petitioner's basis therefor. Issue No. 2(b) - Depreciation (useful life) The lease or permit acquired by petitioner from the United States was for a 10-year period commencing June 1, 1947 and ending May 31, 1957. The lease called *347 for the construction and maintenance of a ski-lift, with steel towers and suitable machinery enclosed in terminal buildings at each end. The lease stated in part: 11. If, on expiration of this permit the Chief, Forest Service, or his authorized representative shall determine that the public interest does not require that the premises be devoted to some other form of use, but will permit of a continuation of the existing use under similar or new conditions, the permittee will be considered the preferred applicant for a new permit subject to the conditions under which new permits for like uses are then granted. * * *
13. Within a reasonable period, to be determined by the Forest Supervisor, after the termination of this permit at the volition of the permittee or by expiration of the term thereof, or by cancellation for cause, the permittee, if all rental charges due the Government have been paid, may remove from the premises all structures that are owned or controlled by him, but upon failure to remove the structures within the specified period they shall become the property of the United States. For purposes of depreciation, the date of petitioner's acquisition of the ski-lift *348 was February 1, 1948. The period from February 1, 1948 through May 31, 1957 was 9 1/3 years. Initially, petitioner claimed depreciation for this asset at the rate of 10.6-10.7 per cent. From February 1, 1948 through September 30, 1950, petitioner's reserve for depreciation totaled $37,113.79. At the end of fiscal 1951, petitioner's accountant extended the asset's remaining useful life. The accountant considered petitioner's prior rate of depreciation, petitioner's permit or lease with the United States, respondent's Bulletin F and accounting practice and procedure. Commencing with fiscal 1951, petitioner's books reflected the asset's "Estimated Remaining Life" as 15 years. From fiscal 1951 through fiscal 1955, petitioner's books reflected depreciation [2] for the ski-lift as follows (in even dollars): Fiscal year end-
Amount of
ing September 30
depreciation
1951
$8,423
1952
8,423
1953
8,419
1954
8,479
1955
8,419
In its returns for fiscal 1952 through *349 1954, inclusive, petitioner reported depreciation deductions in the foregoing respective amounts. From fiscal 1948 through fiscal 1955, petitioner's books reflected the following profits and losses from operations (in even dollars): Fiscal year
ending Sept. 30
Loss
Profit
1948
$10,725
1949
9,309
1950
12,487
1951
$1,238
1952
543
1953
1,660
1954
1,250
1955
8,304 From fiscal 1948 through fiscal 1955, inclusive, petitioner's surplus account had a debit balance. Respondent determined that the remaining useful life of the asset at the end of fiscal 1953 was 15 years or a total useful life of the asset of 20 2/3 years from the date of acquisition. This determination, and the adjustment to petitioner's cost basis of the ski-lift, resulted in respondent's disallowing $4,857.10 of the reported depreciation deduction of $8,479.05. The anticipated useful life of the ski-lift was 20 2/3 years from the date of acquisition. Issue No. 3 - Net Operating Loss Deduction Petitioner's returns for fiscal 1952 and 1953 reported net income (or loss) as follows (in even dollars): Fiscal 1952
Fiscal 1953
Fiscal 1954
Gross Income
$33,438
$34,607
$36,990
Less Deductions: Interest
$ 6,594
$ 6,594
$ 6,594
Depreciation (ski-lift)
8,423
8,419
8,479
Others
18,964
21,254
23,168
Total
$33,982
$36,267
$38,241
Net Income (or Loss)
($ 543)
($ 1,660)
($ 1,250)
*350 Petitioner's return for fiscal 1954 did not report on page 1 any net operating loss deduction. On page 3 of this return petitioner reported that it had a deficit of $1,660.75 for fiscal 1953. Opinion In disposing of the first issue - that is the deductibility as interest of the payments on petitioner's so-called debentures - "none [of the numerous factors] is, by itself, determinative of the ultimate fact question." Gooding Amusement Co., 23 T.C. 408, 418, affd. (C.A. 6) 236 F. 2d 159, certiorari denied 352 U.S. 1031. Our ultimate finding has decided the issue in petitioner's favor because we consider that the elements tending to show that the debentures represented true indebtedness preponderate over those suggesting the opposite conclusion. It will serve no useful purpose to enumerate all of the criteria, but those we regard as most damaging to petitioner are largely outweighed by contrary considerations. For example, the fact that interest could be postponed for up to 3 years seems to us counterbalanced by the additional provision that any longer delay would result in a default of the entire principal. Clyde Bacon, Inc., 4 T.C. 1107. *351 Similarly, the subscription to the debentures by the stockholders in proportionate amounts is coupled with evidence, which we have no reason to disbelieve, that petitioner in good faith first attempted to secure the loans from outside sources, a fact which respondent concedes. Cf. Arlington Park Jockey Club v. Sauber, (N.D. Ill.) 164 F. Supp. 576, 584, affd. (C.A. 7) 262 F.2d 902. Moreover, that the indebtedness was subordinated is outweighed by the lack of other claims and the obvious benefit in facilitating any future refinancing. Sabine Royalty Corporation, 17 T.C. 1071; cf. Sam Schnitzer, 13 T.C. 43, affirmed per curiam (C.A. 9) 183 F.2d 70, certiorari denied 340 U.S. 911. And, of course, the facts that the debentures bore a specified rate of interest, Tribune Publishing Co., 17 T.C. 1228, carried a definite due date, New England Lime Co., 13 T.C. 799, not too far in the future, John W. Walter, Inc., 23 T.C. 550, and represented expenditures for assets which were not overvalued, cf. Emanuel N. (Manny) Kolkey, 27 T.C. 37, affd. (C.A. 7) *352 254 F. 2d 51, all tend to show that this was true indebtedness. [It] does not help in the solution of the problem to speak of the man who invests in stock of a corporation as the one who takes the risks and the creditor as the one who seeks a definite obligation, payable in any event. One who makes a loan to a corporation also takes a risk, and while he may receive evidence of an obligation, payable in any event, often such obligation is never paid. "To say that the advances were 'gambled' and placed at the risk of the business does not help…. All unsecured loans involve more or less risk. On all available information, the risk here was a good one. And it cannot be said * * * that the holders… had no reasonable expectation that they would be repaid." Earle v. W. J. Jones & Son, Inc., 200 F. 2d 846, 851 (C.A. 9). [Byerlite Corp. v. Williams, (C.A. 6) 286 F. 2d 285 (Dec. 15, 1960).] Nor in our view is this a case of thin capitalization since the ratio is not radically different from other situations where the conclusion of indebtedness has been reached. John Kelley Co. v. Commissioner, 326 U.S. 521; John W. Walter, Inc., supra; *353 Ruspyn Corporation, 18 T.C. 769. We conclude that the debentures constituted a genuine indebtedness, and that, hence, the payments in connection therewith were properly deducted as interest for the fiscal year in dispute. We turn next to the depreciation issue. As for the useful life, petitioner has made no attempt to introduce evidence which would rebut respondent's determination. Accordingly, respondent must be sustained on this point. The basis to which the rate of depreciation is to be applied presents a different question, which we think can be resolved by a simple application of the statutes [3] involved. The contract price for constructing the asset in question, which petitioner originally agreed to pay, was greater than the amount that it ever actually disbursed. A dispute between petitioner and the contractor was partly settled and partly disposed of by the running of the statute of limitations. [4] Petitioner claims to be entitled to treat the asset as having a basis equal to the entire original contract price, whereas respondent has disallowed as part of the basis the amounts that were not actually paid. *354 Section 23(n) provides that the basis for computing depreciation is that of section 114 which refers to the "adjusted basis provided in section 113(b)." The latter section, in turn, with exceptions not here material, provides that the adjusted basis is the amount determined under subsection (a) which is "cost." Here petitioner's cost or outlay for acquiring this asset was a sum less than the agreed price. In the light of section 113(a), we do not think the disputed sum, which petitioner was not in fact required to pay, may be regarded as cost when it was not. It may not, accordingly, be included in the asset's basis. See M. Fine & Sons Manufacturing Co. v. United States, 168 F. Supp. 769, 774 (Ct. Cl. 1958). And any suggestion that this "readjustment of purchase price" would have been considered income to petitioner in the year of cancellation fails to find support in the cases. Hirsch v. Commissioner, (C.A. 7) 115 F. 2d 656, reversing 41 B.T.A. 890; A. L. Killian Co., 44 B.T.A. 169, affd. (C.A. 8) 128 F. 2d 433; Des Moines Improvement Co., 7 B.T.A. 279. *355 As for the final issue, the alleged net operating loss deduction, petitioner does not appear to disagree with respondent's statement that "should respondent prevail on either the first or second issue herein, petitioner's claimed loss carry-forward deduction should be denied." Decision will be entered under Rule 50. Footnotes
1. Other facts relating to this permit or lease appear under Issue No. 2, infra.↩
*. Names of wives omitted. ↩
**. This does not reflect those amounts of stock ($2,136.59) and debentures ($10,063.41), totaling $12,200, given to Leonard A. Brennan pursuant to the directors' meeting on May 28, 1947. ↩
***. Not indicated by the record. ↩
*. Referred to in the minutes as Leonard A. Brennan.↩
2. The depreciation computed for fiscal 1951 through fiscal 1954 was based apparently upon a remaining useful life, in fiscal 1951, of 10 to 11 years. The record does not explain these discrepancies.↩
3. All references are to the 1939 Code. ↩
4. "(1) An action upon a contract, obligation or liability not founded upon an instrument in writing; also on an open account for goods, wares and merchandise, and for any article charged in a store account; also on an open account for work, labor or services rendered, or materials furnished; provided, that action in all of the foregoing cases may be commenced at any time within four years after the last charge is made or the last payment is received." Utah Code Ann. 1953, Sec. 78-12-25↩.