**BORDO PRODUCTS COMPANY**
v.
**The UNITED STATES.**
No. 223–69.

United States Court of Claims.
April 13, 1973.

Don S. Harnack, Chicago, Ill., attorney of record, for plaintiff. McDermott, Will & Emery, Chicago, Ill., of counsel.

Jane C. Bergner, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant. Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG, and BENNETT, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on plaintiff's motion, filed March 12, 1973, for judgment pursuant to Rule 141(b), requesting that the court adopt the recommended decision of Trial Commissioner Lloyd Fletcher filed November 29, 1972, under Rule 134(h), as modified by order of February 22, 1973, defendant having withdrawn its notice of intention to except thereto. The court has considered the case without oral argument of counsel and since it agrees with the trial commissioner's recommended decision, as hereinafter set forth,* it grants plaintiff's motion and adopts the decision as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 131(c) in accordance with the decision.

### OPINION OF COMMISSIONER

FLETCHER, Commissioner:

This income tax refund suit requires the court, once again, to enter an area which has been aptly described by Judge Nichols as "devoid of blackletter law, as is true of any tax inquiry seeking the 'substance' of a given transaction." Jack Daniel Distillery v. United States, 379 F.2d 569, 580, 180 Ct.Cl. 308, 326 (1967). The area is frequently referred to as the "debt-equity distinction," and the hundreds of court decisions involving it "defy symmetry." Tyler v. Tomlinson, 414 F.2d 844, 847 (5th Cir. 1969). In the context of the present case, the primary question before the court is whether losses suffered by plaintiff, Bordo Products Company (Bordo), upon the failure of C. M. Pitt & Sons Company (Pitt) to repay some $740,000 loaned it by Bordo qualifies as bad debt under Section 166 of the Internal Revenue Code. Alternatively, says Bordo, in the event these loans or advances do not meet the test of bad debt under Section 166, the advances to Pitt should be deductible as ordinary and necessary business expenses under Section 162 or losses under Section 165(a). Defendant, on the other hand, views the advances made by Bordo to Pitt as having been made to obtain an equity interest in Pitt with an investment motive and thus constituted capital contributions to Pitt. A secondary question is whether Bordo is entitled to claimed deduction for additional depreciation expenses, abandonment losses, salary and

---

* Whereas the court adopts the commissioner's separate findings of fact, which are set forth in his report filed November 29, 1972, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

travel expenses, legal and accounting fees, and escrow and settlement expenses, all of which were related to the transactions between Pitt and Bordo which are described in detail in the findings of fact but which now will only be summarized.

During the years 1958 through 1961 (and for some time prior thereto), Bordo, from its Chicago headquarters, was engaged in the importation, packaging, and resale of dates through a national organization of food brokers. In addition, Bordo also produced and marketed a full line of citrus products from its citrus plant in Florida. The citrus operation was considerably larger than the date operation, although the latter produced by far the larger profit margin. During these years, plaintiff's principal competitor in the wholesale date market was Dromedary, a division of the National Biscuit Company. Along with dates, Dromedary also marketed glacé fruits, cake mixes, and other related food items. Originally, Dromedary had marketed these products through a national food broker organization, but in the first quarter of 1958, Dromedary advised substantially all of its brokers that it was changing its method of marketing and that future sales of these products would be handled by the parent corporation. Accordingly, Dromedary's brokers were terminated as of the end of the year 1958.

This termination action by Dromedary became common knowledge in the wholesale date and glacé fruit business during the spring of 1958. In late April of that year, Bordo began actively to solicit Dromedary's brokers, and by the end of May had succeeded in obtaining the services of over thirty of the former Dromedary brokers. All of these newly acquired brokers had formerly marketed both dates and glacé fruits for Dromedary, and they advised Bordo that they would be interested in continuing to market a line of glacé fruits and peel since it was common for the same buyers to purchase both dates and glacé fruits. Bordo's management tended to agree and reasoned that there were several advantages to having a line of glacé fruits to sell along with its dates. 1) Such a development would no doubt increase the importance of the Bordo account with its newly acquired brokers, thus stimulating the sale of dates. 2) Increased date sales would enable Bordo to secure additional volume discounts in purchasing bulk dates from abroad. 3) Additional profits should be realized from selling refuse citrus peel to a glacé fruit concern rather than to a cattle food processor as had been the custom. 4) Freight costs could be cut by pooling shipments of glacé fruits and dates. 5) Sales of glacé fruit under the Bordo label should provide increased revenues for Bordo.

Accordingly, in the summer of 1958, Bordo's management looked for sources of glacé fruits and related products to supplement its date line with its food brokers. A former Dromedary broker advised Bordo that C. M. Pitt & Sons Company might constitute a good source of supply of glacé fruit and related products.

Pitt, a Maryland corporation, maintained its principal office and place of business in Baltimore at all times relevant to this action. Its principal activity during the years 1958 through 1961, and for some time prior thereto, was the production and sale of glacé fruit, dates, cherries, fountain products, flavors, and currants. In 1958, it enjoyed an excellent reputation in the trade as a quality manufacturer and had recently taken occupancy, under a 20-year lease, of a new plant built to its specifications.

In January of 1959, Arthur Koch, a Bordo vice president, conferred with William Pitt, Sr., president and majority stockholder of Pitt, and another Pitt official at Bordo's Chicago headquarters. Mr. Pitt brought with him financial reports covering his firm's last five years

of operations.[1] In March 1959, Bordo's president, Adolph Ketzler, its auditor, George V. Rountree, C.P.A., and other Bordo employees visited the Pitt facility in Baltimore.

During these negotiations, Pitt advised Bordo that it was desirous of obtaining both long- and short-term credit, additional sales volume of glacé fruit products and assistance in the area of financial management. Bordo advised Pitt that it needed a recognized source of glacé fruits for its brokers, an eastern seaboard location to obtain economies in the marketing of its packaged dates, and a market for its citrus by-products.

Bordo's investigation of Pitt disclosed that Pitt's line of credit with the Fidelity Baltimore National Bank (Baltimore Bank) had been discontinued in 1959, and that as a consequence, Pitt had been forced to factor some of its receivables. Pitt's credit needs were greatest in March through September, its months of inventory buildup. In contrast, Bordo manufactured its citrus products primarily during the months of November through March and borrowed heavily during that period.

From an examination of Pitt's financial statements, it was clear that during the 1950's Pitt's profit margins had eroded until it had sustained an operating loss in 1957 and 1958. The operating losses in those two years had depleted Pitt's working capital. Pitt's profit (loss) from operations as a percentage of net sales showed a decline from 2.14 percent to (7.08 percent) in the years 1954 through 1958. Additionally, Pitt's current ratio (current assets to current liabilities), a factor which Bordo found important in evaluating its own performance, had declined from 5.-99:1 in 1954 to 1.16:1 in 1958.

In March 1959, George Rountree, Bordo's accountant, a recognized expert in the field of accounting for the food processing industry, prepared a comprehensive document entitled "The C. M. Pitt and Sons Company Baltimore, Maryland Sales, Production and Cash Budgets Year Ending December 31, 1959." Budget figures were prepared for three levels of sales, $2,400,000, $2,700,000, and $3,000,000. Net income on these three levels of sales was projected to be $140,000, $171,000, and $209,000, respectively.

In March 1959, Bordo applied for and obtained its seasonal, 2.2 million-dollar line of unsecured credit from its primary banking affiliation, the Harris Trust and Savings Bank of Chicago. Bordo described in detail its negotiations with Pitt to Robert Rodgers, an official of that bank, who had handled the Bordo account since 1942. Rodgers understood that the Fidelity Baltimore National Bank would be extending a $200,000 line of credit to Bordo and that Bordo would guarantee the bank's $450,000 line to Pitt. He thought that, in addition, Bordo would be making a $200,000 advance to Pitt. Rodgers' understanding that Bordo would provide Pitt with sales and managerial assistance and his receipt of an opinion from counsel that Bordo would not become liable on Pitt's 20-year plant lease with the Chatim Corporation were important factors in his ultimate decision to recommend approval of Bordo's credit application.

On April 8, 1959, Bordo and Pitt entered into a written agreement whereby Bordo obligated itself to furnish Pitt a 5 percent 5-year term loan of $200,000. As security, Bordo obtained a chattel mortgage on substantially all of Pitt's office and plant equipment (net book value $297,208.58).

There were certain preconditions to Bordo's $200,000 loan. Pitt restructured and realigned its management team in order to facilitate success. Upon Bor-

1. Whether or not these statements included the statement for 1958 is not clear from the record, as the 1958 statement bears the date January 27, 1959. However, it is certain that this report was seen by Bordo prior to the finalization of the agreement described below.

do's advice, Pitt's board of directors created and staffed the position of controller in order to insure improved financial recordkeeping, as Pitt's system of accounting had been characterized by Bordo's accountant as inadequate and outdated. Pitt's common stockholders entered into an agreement with Bordo whereby Bordo was granted a five-year option to purchase all (945) or any portion of Pitt's outstanding common stock at par value ($100 per share).[2] Pitt underwent a recapitalization whereby Pitt's 8 percent first (1,021 shares outstanding) and second (authorized but unissued) preferred capital stock classes were eliminated.[3] A class of 5 percent preferred stock was issued in their place and offered to holders of first preferred on a one-for-one basis.

Bordo informally agreed to make available to Pitt production advances, as needed, and management assistance in the area of financial controls. Bordo's management projected that Pitt would require $450,000 to $850,000 of such financing in the months of April through September 1959. Pitt and Bordo informally agreed that Pitt would sell Bordo glacé fruit under both Bordo's and Pitt's label at dealer's cost, less 10 percent. Bordo anticipated no direct profit on its sales of glacé fruit, but contemplated a proportional reduction in its overhead, as well as stimulation of its date sales.[4] Pitt also agreed to purchase Bordo's refuse peel for use in glacé fruit production and promised to make available warehouse space in its Baltimore facility for the storage of Bordo's dates.

Bordo advanced $876,000 to Pitt in calendar year 1959 in exchange for unsecured 5½ percent cognovit demand notes. These advances were based upon Pitt's cash needs to produce inventory for the 1959 selling season and were to enable Pitt to keep its other creditors on a current basis. Throughout this period, Pitt prepared and submitted to Bordo monthly cash flow statements detailing Pitt's situation. At Bordo's request, a telex machine was installed at Pitt as a means of facilitating communication. Ray Watkins, a Bordo employee, spent 124 workdays during 1959 at the Pitt plant. He set up accounting, cost, and financial systems for Pitt; audited Pitt's first six months' operations; worked on production control; and assisted Arthur Koch who spent 45 workdays in 1959 at the Pitt facility.

In July 1959, George Rountree, Bordo's accountant, prepared a revised budget for 1959. This budget was less optimistic than his prior projections, and contemplated a $76 net loss for the year (net operating gain $18,718). However, the news was far from totally negative. Even based upon concededly conservative assumptions, the revised budget forecast that Pitt would be able to repay all its existing and projected 1959 borrowings by the close of that calendar year.

In August 1959, however, Bordo became uneasy about Pitt's condition. Pitt was experiencing production problems, and Bordo's Arthur Koch expressed concern whether Pitt would be able to make timely delivery of its products. Bordo's Florida general manager and plant superintendent both spent time at the Pitt plant reviewing its production facilities. Bordo's executives thought it would be prudent to exert Bordo's influence as a creditor to force out Pitt's general manager and with Pitt, Sr.'s agreement, began to search for a professional manager from another company.

---

2. Because the holders of 125 of the common shares dissented to the above arrangements, a Bordo stockholder purchased the shares from the shareholders at par prior to the execution of the agreement. In June of that year Bordo acquired these 125 shares from its stockholder at par.

3. When a trustee holding 50 of Pitt's first preferred shares refused to consent to the above transaction, his shares were purchased by Bordo at $60 per share.

4. Freight and brokerage charges, cash discounts and administrative costs eliminated the possibility of a direct profit.

Toward the end of the month, Bordo began to doubt that Pitt's sales would be as high as predicted in the revised budget. Bordo contacted its Baltimore attorneys to determine its creditor's remedies. Bordo's attorneys responded in the following manner:

It will be seen that if Pitt should make payments or transfer assets to Bordo on account of its existing debts and if bankruptcy proceedings should be started against Pitt within four months thereafter, any payments which may be made to Bordo or any property which may be transferred to Bordo on account of prior loans at a time when Bordo has knowledge of the insolvency of Pitt, may be set aside by a bankruptcy trustee thereafter appointed as voidable preferences and Bordo may be required to repay any amounts so received, so that money can be divided among the creditors in accordance with the Bankruptcy law.

It is important, therefore, if any payments are to be made to Bordo, that no Petition in Bankruptcy can be filed against Pitt within a period of four months after any such payments are made.

To that end, if Pitt is to begin liquidating its assets so as to make payments to Bordo on account of its debt, we strongly recommend that all general creditors of Pitt be paid in the ordinary course of business, and that no unpaid indebtedness be allowed to exist which would form the basis for a Petition in Involuntary Bankruptcy.

In accordance with its attorneys' advice, Bordo never demanded repayment and advanced another $60,000 in September 1959 to permit Pitt to keep its other creditors on a current basis. By yearend, Pitt had repaid $390,000 of the 1959 production advances.

Through contacts in the food industry, Bordo located one Lawrence Weitz, a man exceptionally well-qualified in the production of glacé fruit and an experienced executive. Weitz was interviewed in Baltimore for the general managership of Pitt by Bordo's Ketzler, Koch, and Watkins and by Pitt's controller, Fred Coover. Upon Bordo's advice, Pitt's president offered Weitz the position; Weitz accepted and began work at Pitt in December of 1959.

Unhappily, Pitt's 1959 audit report, available February 1, 1960, revealed a net loss of $264,103. This figure did not take into account the interest owing on Bordo's advances. In fiscal 1959, Bordo received $941.66 interest from Pitt and waived interest of $28,697.58. Bordo never accrued this interest on its books, financial statements, or tax returns. While a net loss of $76 (net operating gain of $18,718) had been projected as early as July, Bordo's management was surprised and displeased with the actual results. Mr. Rodgers of the Harris Bank indicated that his bank would be reluctant to continue its line of credit to Bordo unless Bordo got the Pitt operation under control and made sure that Pitt's management problems were corrected.

In early 1960, Bordo learned from Weitz that although Pitt's building was new, much of its plant equipment was old, poorly designed or otherwise inappropriate. Pumps and other equipment were damaged by corrosion and were often leaking because they were made of materials other than stainless steel. These and other equipment defects produced food discoloration, contamination, and similar quality control problems. Additionally, it appeared that Pitt was losing up to $100 per day in sugar syrup due to a defect in a machine fitting.

Early in 1960 Bordo's accountant furnished Bordo with an appraisal of Pitt's "Company Procedures." The report stated that as of January 18, 1960, Pitt's accounts were not balanced; its bank statements were not reconciled; its social security records were not up to date; its commissions payable were not properly analyzed, and its inventory records were inaccurate. The report also criticized Pitt's lack of a fixed bill-

ing policy and poor customer credit evaluation procedures.

Other problems at Pitt came to the attention of Bordo management in late 1959 and early 1960: 1) It appeared that in some cases Pitt had purchased five, ten, or even fifteen times its raw material requirements in order to avail itself of a small noncompensating volume discount. Much of the material purchased was of a quality higher than that needed to be competitive, and even then Pitt failed to follow up with suppliers who furnished defective products. 2) Pitt's quality control procedures were inadequate as there was a tendency to test products only on completion, rather than at each step in processing. Errors were caught only after large batches had been defectively manufactured. 3) There was no systematic program for analyzing Pitt's product mix to determine a) why some items were declining in sales; b) whether new products or formulations could be developed; and c) whether each of Pitt's many low-volume products was profitable to the corporation. 4) It appeared that Pitt's income in 1959 had been affected by a price war which had developed in the glacé fruit business. Intense price competition was initiated by such nationally advised firms as S and W Fine Foods, Inc., and the National Biscuit Company (Dromedary).

In February 1960, Bordo's management reappraised its position with respect to Pitt. They consulted Weitz, George Rountree, and Rodgers of the Harris Bank. Weitz expressed the opinion that under his supervision Pitt could break even in 1960, without reference to the interest on or the balance of Bordo's 1959 advances still outstanding. Bordo saw that it had two alternatives: 1) enforcing its rights as a creditor to the fullest extent, advancing no more money to Pitt and demanding immediate repayment of existing advances, or 2) letting the existing advances remain outstanding and extending additional credit in order to permit Pitt to operate in rehabilitated form in 1960. Bordo determined to finance Pitt through the fall of 1960 in the then reasonable belief that its 1960 advances would be repaid by the end of the 1960 selling season. Bordo hopefully anticipated that Pitt would then be in a position to generate enough profits so as to be able to repay Bordo in full.

Bordo advanced $865,000 in cash to Pitt during the calendar year 1960 in exchange for interest bearing, unsecured demand notes. Like their 1959 counterparts, these advances were used to finance Pitt's 1960 inventory. As was the case with the 1959 advances, Bordo did not intend to profit from the interest it charged Pitt, since the rate which Bordo paid the Baltimore bank for the money was substantially equivalent to the rate which Bordo charged Pitt for these same funds. Bordo expected that the continued availability of a source of glacé fruit would stimulate date sales as had been the case in 1959.

Advice from Weitz on Pitt's six months' operating results caused Bordo's management to conclude that Pitt would operate at least on a break-even basis in 1960. Sometime during the first week of October, Weitz informed Bordo that based upon the third quarter inventory, it now seemed that Pitt would suffer a loss for the year. Upon notification of this fact, Bordo requested that Pitt take all possible steps to reduce cash expenditures until the fourth quarter operating results were ascertained. Bordo made no further advances to Pitt after October 5, 1960.

During the months October through December 1960, Pitt repaid $280,000 in production advances and made a single payment of $20,000 on the loan secured by the chattel mortgage. In addition, Pitt paid $10,112.45 interest on production advances to Bordo in fiscal 1960. Bordo returned this interest to Pitt, and never accrued interest on these advances to Pitt on its books, financial statements or tax return. Pitt paid interest on its chattel mortgage once on April 14, 1960, in the amount of $1,019.18. There were

no interest expense accruals on Pitt's books after June 30, 1960.

Pitt's 1960 report disclosed net sales of $2,050,492 and a net loss of $348,539 after waiver by Bordo of interest due it in 1960 in the amount of $46,971. Pitt's book liabilities exceeded its assets by $201,570. The prices charged for Pitt's products were reduced approximately 8½ percent during 1960. This reduction was essentially a consequence of the above-mentioned price war which was begun in 1959 by industry leaders. If Pitt had maintained the same level of prices in 1960 as it had charged in 1959 and it had not been forced to meet Dromedary's policy of prepaying freight on Christmas shipments of glacé fruit, $200,000 of Bordo's loss probably would have been eliminated.

After learning of these results, Bordo officials conferred with Messrs. Weitz, Rodgers, and Rountree. Rodgers advised that his bank would not continue its line of credit to Bordo unless Bordo stopped advancing money to Pitt. As a condition to Bordo's own inventory financing, Rodgers insisted that Bordo take steps to liquidate the funds it had lent Pitt.

Rountree was of the opinion that Pitt's indebtedness to Bordo could be collected, with at worst a loss of $151,000. He recommended that Pitt be sold as a going concern. Bordo representatives were elected to Pitt's board with a view to facilitating Pitt's sale or liquidation. Bordo was advised by its Baltimore attorneys that its losses would be increased if it allowed Pitt to be thrown into bankruptcy by its general creditors. Bordo was advised to see that Pitt was liquidated in a manner so as to maintain all of its creditors other than Bordo on a current basis. Bordo supervised the liquidation of Pitt's assets, and Pitt vacated its plant by August 31, 1961. During the period January 1 to September 30, 1961, Pitt repaid $510,811.40 of the amount owed Bordo.

Pitt's landlord, the Chatim Corporation, filed an action for damages totaling one million dollars against Pitt and Bordo on April 9, 1962. Chatim alleged that Pitt had broken its lease, and also alleged improper action on the part of Bordo, due to alleged responsibility for the breaking of Pitt's lease to Chatim. This action was dismissed with prejudice following Bordo's compromise payment to Chatim of $22,500.

Insofar as pertinent to the present controversy, Section 166(a) of the 1954 Internal Revenue Code provides as follows:

> (1) Wholly Worthless Debts.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

The apparent simplicity of this provision is entirely delusive. In the present context, the problem is the meaning of the statutory word "debt." Defendant, as pointed out above, contends that Bordo's loans to Pitt were in reality merely "advances" of capital contributions for the purpose of acquiring an "equity" interest in Pitt, and hence no debtor-creditor relationship between the two corporations ever came into being. Plaintiff, to the contrary, asserts that under the circumstances of the case, Bordo's "advances" were clearly intended to be loans to Pitt both in form and substance. This question of whether a particular corporate obligation is "debt" or "equity" has been presented to this court on a number of prior occasions. *See* Affiliated Research, Inc. v. United States, 351 F.2d 646, 173 Ct.Cl. 338 (1965); American Processing and Sales Co. v. United States, 371 F.2d 842, 178 Ct.Cl. 353 (1967); Jack Daniel Distillery v. United States, 379 F.2d 569, 180 Ct.Cl. 308 (1967); Liflans Corp. v. United States, 390 F.2d 965, 182 Ct.Cl. 825 (1968); and Sayles Finishing Plants, Inc. v. United States, 399 F.2d 214, 185 Ct.Cl. 196 (1968). Experience with § 166 and § 163(a) (allowing a deduction for interest on "indebtedness") has not proven that the terms "debt" and "equity" are

well understood and need no further definition.[5] On the contrary:

There is no dearth of cases in this province of tax law. So large is their number and disparate their facts, that for every parallel found, a qualification hides in the thicket. At most they offer tentative clues to what is debt and what is equity for tax purposes; * * * (American Processing and Sales Co., supra, 371 F.2d at 848, 178 Ct.Cl. at 362–363.)

In Liflans Corp. v. United States, supra, 390 F.2d 968, 182 Ct.Cl. at 831–832, this court identified five factors which it called "basic to the debt-equity distinction", and in Cuyuna Realty Co. v. United States, 382 F.2d 298, 302, 180 Ct.Cl. 879, 886 (1967) eight "indicia of contributions to capital" were listed. Other courts have listed as many as fifteen,[6] and a recent commentator has listed at least 25 "evidentiary factors."[7] In the final analysis, each case must be reviewed with an eye to its "unique factual flavor," and as a composite of "many diverse external elements pointing in the end to what is essentially a subjective conclusion."

American Processing and Sales Co., supra, 371 F.2d at 848, 178 Ct.Cl. at 363.[8]

## The Formal Rights of Creditors as Opposed to those of Stockholders

Classic definitions of debt emphasize the necessity for a fixed or determinable time when the debtor can be unconditionally required to make repayment.[9] Undeniably, the April 8, 1959 mortgage agreement provided a definite schedule for the repayment of the $200,000 advance.[10] The 1959 and 1960 production advances were all evidenced by issue-dated cognovit demand notes and thus were comfortably within the ambit of the classic definition since Bordo could demand repayment at any time. In his article cited in footnote 7, supra, Mr. Plumb makes the following pertinent observation at 418:

A demand note, although it sets no definite time for payment, does have an ascertainable due date which is within the control of the purported creditor [citing cases], and therefore may be recognized as debt if other factors are favorable [citing cases].

It is clear that both the $200,000 loan secured by the chattel mortgage [11] and

5. But see John Kelley Co. v. Commissioner, 326 U.S. 521, 530, 66 S.Ct. 299, 90 L.Ed. 278 (1946).

6. Tomlinson v. 1661 Corp., 377 F.2d 291, 296 (5th Cir. 1967).

7. Plumb, The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal, 26 Tax L.Rev. 369, 411–412 (1971). This brilliant analysis of the debt-equity area of tax law stands in a class by itself. The article is the most comprehensive treatment of the subject to date.

8. One recent decision compared the "often intuitive and subjective" process here involved to the problem of judicially defining pornography, of which Mr. Justice Stewart said, "perhaps I could never succeed in intelligibly doing so. But I know it when I see it. * * *" Sansberry v. United States, 70–1 U.S.T.C. ¶9216 (S.D. Ind.1970), citing Mr. Justice Stewart's concurring opinion in Jacobellis v. Ohio, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.

2d 793 (1964). See also, Waldemar J. Coliz, 22 T.C.M. 1775, 1785 (1963).

9. In Sayles Finishing Plants, Inc., supra, 399 F.2d at 218, 185 Ct.Cl. at 203, the court characterized the following from Gilbert v. Commissioner, 248 F.2d 399, 402 (2d Cir. 1957), as a "well-stated definition of debt":
"The classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof. While some variation from this formula is not fatal to the taxpayer's effort to have the advance treated as a debt for tax purposes, * * * too great a variation will of course preclude such treatment."

10. Finding 33 (note 4). (See commissioner's report of November 29, 1972.)

11. The loan agreement and the recorded chattel mortgage, both dated April 8, 1959, contained standard default clauses for the protection of Bordo as mortgagee.

the 1959–1960 unsecured production advances evidenced by demand notes provided Bordo with the usual rights of a creditor upon default.[12]

■ The 1959 and 1960 demand notes contained no provisions compromising Bordo's position as a creditor, and no subsequent agreements were executed subordinating either those notes or the $200,000 mortgage loan.[13] While subordination may[14] negate "an important characteristic of a debtor-creditor relationship: the right to share with general creditors in corporate assets upon dissolution or liquidation" (*Liflans Corp., supra,* 390 F.2d at 971–972, 182 Ct.Cl. at 837) the *absence* of subordination has been recognized as evidence of debt. Royalty Service Corp. v. United States, 178 F.Supp. 216, 220 (D.Mont.1959). Interest on both the $200,000 loan and the 1959 and 1960 production advances was payable unconditionally, a factor indicative of debt. *Liflans, supra,* 390 F. 2d 965, 182 Ct.Cl. at 832. The Government has stressed repeatedly the admitted fact that Bordo did not contemplate making a direct profit from the interest generated by its advances to Pitt. It is not denied that the funds borrowed from the Baltimore bank by Bordo were loaned to Pitt at approximately the same rate as the bank charged to Bordo. Most lenders, of course, do intend to profit directly from the interest charged, and the interest rate is adjusted in accordance with the risk undertaken. Absent countervailing considerations, the failure to charge a rate of interest commensurate with the risk undertaken points to the conclusion that a capital contribution is involved. Here, other factors are involved, however, and this court has recognized as a "commercial commonplace" certain instances where the *quid pro quo* is other than a direct profit on the money advanced. *American Processing and Sales Co., supra,* 371 F.2d 842, 178 Ct.Cl. at 379; *see also,* George E. Warren Corp. v. United States, 141 F.Supp. 935, 938, 135 Ct.Cl. 305, 309 (1956), and Byerlite Corp. v. Williams, 286 F.2d 285, 290–291 (6th Cir. 1960). In the instant case, by its dealings with Pitt, Bordo looked toward a more profitable market for its citrus by-products, increased volume discounts on dates purchased from abroad, and reduced freight charges brought about by the pooling of date and glacé fruit shipments. Most importantly, Bordo looked toward the stimulation of date sales which it considered would be brought about by furnishing its newly acquired brokers with a recognized glacé line.

At page 13 of its brief to the commissioner, defendant discusses Bordo's management assistance to Pitt, stating:

\* \* \* \* \* \*

While there is some disagreement between the parties as to the degree to which Bordo supervised Pitt's operations in 1959 and 1960, it is clear from both the testimony and the exhibits that Bordo did participate to a substantial extent in Pitt's operations. *Defendant contends that such participation is sufficient to support a holding that Bordo's unpaid advances to Pitt were equity as a matter of law.* [Emphasis supplied.]

\* \* \* \* \* \*

■ It is true that courts have listed participation in management as one of the factors to be considered in making the debt-equity distinction, *e. g.* Berkowitz v. United States, 411 F.2d 818, 820 (5th Cir. 1969). *See,* Plumb, *supra,* at

---

12. Jewel Tea Co., Inc. v. United States, 90 F.2d 451, 453 (2d Cir. 1937); United States v. South Georgia Ry. Co., 107 F.2d 3, 5 (5th Cir. 1939).

13. In fact, the loan agreement contained clauses which had precisely the opposite effect.

14. "Subordination to general creditors is not necessarily indicative of a stock interest. Debt is still debt despite subordination." Kraft Foods Co. v. Commissioner, 232 F.2d 118, 125–126 (2d Cir. 1956); accord, *Jack Daniel Distillery, supra,* 379 F.2d 569, 180 Ct.Cl. at 328–329; Commissioner v. O. P. P. Holding Corp., 76 F.2d 11, 12 (2d Cir. 1935).

447–450. However, this factor while meriting close scrutiny can hardly be considered as converting the entire question to one of law. The validity of loans even to a controlled corporation is well established. *George E. Warren Corp., supra,* 141 F.Supp. 935, 135 Ct.Cl. at 312; Wilshire & Western Sandwiches, Inc. v. Commissioner, 175 F.2d 718, 721 (9th Cir. 1949); Byerlite Corp. v. Williams, *supra.*

Indeed, as noted in Plumb, *supra,* at 447:

\* \* \* \* \* \*

\* \* \* it is still almost correct to say, as one court said long ago, that "The question of voting rights and a voice in management of the company has frequently been discussed but has never been stressed in the determination of the issue." Citing Jordan Co. v. Allen, 85 F.Supp. 437, 443 (M.D. Ga.1949).

Even if defendant's statement of the law were correct, its factual predicates are hardly supported in the record. While the loan agreement and chattel mortgage contain some creditor-type language restricting Pitt's conduct as a corporate entity, neither agreement grants Bordo a voice in the management of Pitt's affairs, nor does any subsequent agreement. The substance does not betray the form as defendant urges. From the outset of the negotiations, it was recognized that Pitt was in serious need of assistance in the area of financial management, and that Bordo's management would endeavor to furnish it. On Bordo's advice, Pitt hired a controller. Bordo's Ray Watkins spent considerable time at Pitt's plant in 1959 where he set up accounting, cost, and financial systems for Pitt, audited Pitt's operations for the first six months of 1959, worked on production control, and assisted Bordo's vice president, A. L. Koch.

It is true that during times of unexpected disappointment in Pitt's operations during August and September of 1959, Koch spent considerable time at the Pitt plant and that he was frequently consulted with respect to overall policy guidance. This fact is partly attributable to the unforeseen inability of Pitt's general manager to produce an acceptable product at a competitive price and partly to Bordo's concern as Pitt's largest creditor for firsthand information on the condition of its debtor. With the prior agreement of Pitt, Sr., Bordo was instrumental in procuring the services of an experienced manager in the glacé fruit field, Lawrence Weitz. Once Weitz had been employed by Pitt as its general manager, Bordo's involvement in Pitt's operations dramatically declined since Bordo had the utmost confidence in Weitz's managerial abilities.

█ Even after giving the matter the close scrutiny it deserves, it can only be concluded that Bordo's advice and participation in management activities were no more than should be expected of a large creditor sincerely worried about its debtor's inefficient operations and bad financial plight.

### Factors Indicating an Intention to Create a Debtor-Creditor Relationship

█ The names ascribed to the Bordo-Pitt documents in question were "loan agreement," "chattel mortgage," and "demand notes." "While the form of the instrument is not controlling, it is relevant and entitled to consideration." *Liflans Corp., supra,* 390 F.2d at 969, 182 Ct.Cl. at 832. *See, also,* Crawford Drug Stores, Inc. v. United States, 220 F.2d 292 (10th Cir. 1955). Whatever the nomenclature, of course, any instrument is vulnerable to a challenge that its form does not comport with its substance.[15] On this record, it is be-

---

15. "The question always is whether the transaction under scrutiny is in fact what it appears to be in form; a marriage may be a joke; a contract may be intended only to deceive others; an agreement may have a collateral defeasance." Chisholm v. Commissioner, 79 F. 2d 14, 15 (2d Cir. 1935), cert. denied, Helvering v. Chisholm, 296 U.S. 641, 56 S.Ct. 174, 80 L.Ed. 456 (1935).

lieved that the form and substance of the Bordo-Pitt transaction coincide.

■ Defendant devotes a significant portion of its brief to the contention that "plaintiff's declarations of subjective intent are irrelevant and immaterial." Defendant's case citations do not support its conclusion, but rather confirm that such declarations are relevant and will be considered but with the caveat that they will never be determinative by reason of being infected with a self-interest that cannot prevail over inferences drawn from objective acts. *Cf.* Rombach v. United States, 440 F.2d 1356, 1359, 194 Ct.Cl. 530, 534 (1971). The fact that a party has sought to protect its creditor status by obtaining security enhances the possibility that its advances will be considered debt rather than capital contributions. *See,* Ackerson v. United States, 277 F.Supp. 475, 477 (W.D.Ky.1967). Bordo's initial $200,000 advance was secured by a chattel mortgage on substantially all of Pitt's office and plant equipment with a net book value of $297,208.58. Defendant makes much of the fact that the 1959 and 1960 advances evidenced by numerous demand notes were unsecured. Defendant suggests that a true creditor would have sought " * * * the minimal protection of an inventory financing lien * * *." However, on this record, I have concluded that, by assuring itself through monthly cash flow and production reports that its 1959 and 1960 production advances were being converted into inventory, and by effective restrictions in the mortgage documents of Pitt's ability to encumber its assets, Bordo was behaving in the manner of a true creditor as distinguished from an equity investor. Only by virtue of 20-20 hindsight is it now possible for defendant to suggest other means whereby Bordo's attorneys might have more effectively protected Bordo's rights against Pitt.

■ Proportional holdings of debt and stock have always been considered as indicative of equity rather than debt.

*American Processing and Sales Co., supra,* 371 F.2d 842, 178 Ct.Cl. at 363; *Liflans Corp., supra,* 390 F.2d 965, 182 Ct.Cl. at 836–837; *Affiliated Research, Inc., supra,* 351 F.2d 646, 173 Ct.Cl. at 344–345. However, it is also clear from *Liflans* that something more than this single factor must be present, and this would seem consistent with the fact that a viable debt may be recognized even where the debtor is a controlled corporation. *Byerlite, supra*; *George E. Warren Corp., supra.* It is better to characterize the impact of such a fact as rendering the transaction "suspect" and subject to "close scrutiny." *Sayles Finishing Plants, Inc., supra,* 399 F.2d 214, 185 Ct.Cl. at 208; *George E. Warren Corp., supra,* 141 F.Supp. 935, 135 Ct.Cl. at 312.

It is reasoned that the holder of proportionate amounts of debt and equity will not force repayment of the debt if such enforcement would jeopardize its equity interest. Tyler v. Tomlinson, *supra,* 414 F.2d at 849. Bordo owned 125 shares of Pitt Common and 50 shares of Pitt Preferred, as well as an option to purchase the remaining 820 shares of Common at $100 per share. Defendant argues that there was thus an identity of interest between Bordo's and Pitt's shareholders which indicates that the "1960 advances were not conceived of as debt," citing P. M. Finance Corp. v. Commissioner, 302 F.2d 786 (3d Cir. 1962); Indian Lake Estates, Inc. v. Stewart, 448 F.2d 574 (5th Cir. 1971); Foresun, Inc. v. Commissioner, 348 F. 2d 1006 (6th Cir. 1965); Motel Co. v. Commissioner, 340 F.2d 445 (2d Cir. 1965); Wilbur Security Co. v. Commissioner, 279 F.2d 657 (9th Cir. 1960); *cf.* Brown Shoe Co., Inc. v. Commissioner, 339 U.S. 583, 70 S.Ct. 820, 94 L.Ed. 1081 (1950).

None of defendant's cases present a fact situation truly comparable to the transaction in question. These cases primarily stand for the proposition that the "non-issuance of shares of stock * * * is not necessarily controlling in determining the character of the

transaction for tax purposes." *Foresun, Inc., supra,* 348 F.2d at 1009; *see Indian Lake Estates, Inc., supra,* 448 F.2d at 579. While it is true that the value of Bordo's stock option could be expected to increase with the success of Pitt's business, it is unreasonable to assume on this record that Bordo would therefore have risked its very substantial loans and advances merely to shore up a potential equity position. The most the Government can expect from the existence of the option is that this will cause the court to scrutinize closely all other factors.

 Failure of a creditor to insist on regular interest payments has been viewed as a pertinent factor in making the debt-equity distinction. *Tyler v. Tomlinson, supra,* 414 F.2d at 849. In 1959 Bordo received a total of $941.66 interest from Pitt. It waived interest of $28,697.58. Bordo never accrued this interest on its books, financial statements, or tax returns. Failure of a creditor to insist on repayment of an installment of a note when due or an inappropriate delay in making demand in the case of a demand note is also indicative of concern for an equity investment, *Tyler v. Tomlinson, Id.* at 849; *Cuyuna Realty Corp., supra,* 382 F.2d 298, 180 Ct.Cl. at 886.

However, intent at the time the advances were made is an important consideration, and subsequent unexpected economic developments may well explain the fact of forbearance. *Liflans Corp., supra,* 390 F.2d 965, 182 Ct.Cl. at 830–831. Here, Pitt's inability to make interest payments and to repay production advances was caused by unexpected production problems, lower than anticipated sales, and spiraling manufacturing costs. The advice of Bordo's attorneys was also important in Bordo's decision not to make an immediate demand for its production advances or to declare the $200,000 loan in default. In August of 1959, Bordo's attorneys advised it to see

that Pitt's general creditors were paid in the ordinary course of business in order to insure that a petition for involuntary bankruptcy was not filed against Pitt. Such an eventuality, they advised, would have rendered any payments to Bordo voidable preferences if made within four months of Bordo's knowlege of Pitt's insolvency. Additionally, such an eventuality would have interfered with the orderly liquidation of Pitt's inventory. Thus, Bordo advanced Pitt an additional $60,000 in September 1959 in compliance with its attorneys' advice.

The question whether Bordo's decision to forbear and continue advances in 1960, once 1959 adverse results were known, was a creditor's decision or an equity investment will be discussed below.

### Factors Bearing on the Reasonableness or Economic Realities of of the Transaction

 This court and others have mentioned the purported debtor's inability to obtain funds from an outside lender under the same conditions as a factor in making the debt-equity distinction. *Cuyuna Realty Co., supra,* 382 F.2d 298, 180 Ct.Cl. at 886; *Lynch v. United States,* 337 F.Supp. 1297, 1299 (N.D.Ga. 1971). While it may be an adverse factor, the inability of a purported debtor to procure such a loan is not an unfailing bar to bad debt treatment for the purported creditor. *Brighton Recreations, Inc. v. Commissioner,* 20 T.C.M. 127, 135 (1961); *American Processing and Sales Co., supra,* 371 F.2d 842, 178 Ct.Cl. at 370.

In the present case, it has been found, over plaintiff's objection, that the Baltimore bank had curtailed its line of credit to Pitt in 1959. That is at least one reason why Pitt sought the financial and other arrangements with Bordo which have been described at length herein.[16] Ordinarily, this fact would weigh against plaintiff's claim. How-

---

16. No proof has been offered concerning the ability or inability of Pitt to obtain credit from another source.

ever, it is to be remembered that in this case the motivation and effective rate of return to Bordo was much higher than the 5, 5½, or 5¾ percent interest charged. Bordo contemplated that substantial indirect profits and other benefits would inure to it from this transaction. Thus, the availability of loans to Pitt from outside sources at the 5–5¾ percent rate with the security offered is not particularly material.

Plumb, *supra*, ftn. 7, at 526 states:

\*　\*　\*　\*　\*　\*

Perhaps the most obvious criterion of whether payment of a purported debt may reasonably be expected is the projection of the sources from which payments may be made. In general, there are only four possible sources for consideration: (1) liquidation of assets, (2) profits from the business, (3) cash flow, and (4) refinancing with another lender.

\*　\*　\*　\*　\*　\*

██ Pitt and Bordo predicted that Pitt would realize a substantial profit in 1959. There was no question in the minds of the respective managements that there would be funds for the repayment with interest of both the $200,000 loan installment and projected production advances. It is true that in July 1959, Bordo's accountant prepared a revised budget for Pitt projecting a net loss of $76. Even based upon concededly conservative assumptions, however, the revised budget forecast a cash flow sufficient to repay all existing and projected advances with interest at the conclusion of Pitt's selling season. Thus, as plaintiff contends, the absence of a sinking fund is without significance. Unhappily, Bordo's and Pitt's reasonable projections were frustrated by unexpected events: lower than anticipated sales, production problems, and spiraling manufacturing costs.

Early in 1960, Bordo was faced with a Hobson's choice between asserting immediately its creditor's rights (which no doubt would have meant liquidation of Pitt) or forbearing its right and con-

tinuing to advance funds on the same basis as in the previous year. The decision had to be made before Pitt was called upon to commit funds for raw materials. Defendant contends that "\* \* \* Bordo would be repaid only if Pitt's 1960 selling season were successful; if the season were not successful, Bordo anticipated that it would not be repaid." If this were true, Bordo's advances would surely have been "at the risk" of Pitt's business, and more likely capital contributions than debt.

However, defendant errs factually. The predicted cash flow from a break-even year would have been sufficient to repay 1960 production advances and the mortgage debt installment, with interest. Plaintiff's decision to continue was based upon the reasonable belief that Pitt's new general manager could control the production problems and wasteful expenditures which had plagued Pitt in the previous year.

The first six months' results supported Bordo's predictions, but third-quarter results indicated that Pitt would again suffer a loss. A buyer for the firm was sought both by Bordo and Pitt principals but without success. Rightly or wrongly Bordo was again advised to see that Pitt's general creditors were paid in the ordinary course in order to avoid the problem of voidable preferences. This was also necessary to insure the orderly disposition of Pitt's inventory.

It is significant that the decision to continue advancing funds to Pitt in 1960 was reviewed by Bordo's bankers. It will be remembered that the Harris Bank was also consulted when Bordo initially considered the transaction and after problems developed in August of 1959. Rodgers of the Harris Bank made it quite clear at trial that he would not have recommended to his bank an advance of funds to Bordo for its own inventory financing in 1960 if he had fully understood that Bordo planned to commit funds to Pitt other than on a short term basis until Pitt's inventory was liquidated. Any other type of commitment would have reduced Bordo's own work-

ing capital and reduced its ability to pay back its own seasonal borrowing to the Harris Bank.

From the foregoing consideration of all the many factors involved, Bordo's status as a creditor of Pitt emerges clearly. Accordingly, upon Pitt's ultimate failure to repay the loan balance of approximately $740,000, Bordo suffered a bad debt loss within the meaning of section 166.

There remains only the secondary question of whether, in addition, Bordo is entitled to deductions for certain depreciation expenses, abandonment losses, salary and travel expenses, legal and accounting fees, and stock escrow and settlement expenses, all connected directly to the Bordo-Pitt transaction. The facts with respect to these several items are detailed in findings 84 through 89. (See commissioner's report of November 29, 1972.) It is sufficient here to note only salient facts as to the major items.

The depreciation expense and abandonment loss arose out of machinery and equipment admittedly owned by Bordo but loaned by it to Pitt; the salary and travel expenses were those of Bordo's officials incurred in traveling to Baltimore for consultation with Pitt's officials; and the legal and accounting fees related mainly to Pitt's liquidation and the defense of a lawsuit filed against both Pitt and Bordo by Pitt's landlord, a lawsuit ultimately settled by Bordo.

Defendant agrees that the resolution of this issue "is directly related to the determination of the debt-equity issue." Since the latter issue has been resolved in favor of plaintiff, it logically follows that this secondary issue must likewise be resolved for plaintiff.

However, of "additional concern here," says defendant, is whether Bordo received the benefit of these expenses so as to be entitled to their deduction. In defendant's view only Pitt benefited from these expenses.

This specious argument deserves but little comment. From the record it is entirely clear that, while Pitt was indeed an incidental beneficiary of these expenses, it was Bordo who primarily benefited therefrom. Therefore, Bordo, not Pitt, is the taxpayer entitled to the deduction.

Plaintiff is entitled to judgment with the exact amount of recovery to be determined pursuant to Rule 131(c).

NICHOLS, J., concurs in the result.

### CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment is entered to that effect, with the determination of the amount of recovery to be reserved for further proceedings under Rule 131(c) in accordance with this opinion.