**CENEX, INC., (formerly known as Farmers Union Central Exchange, Inc.,) And Subsidiaries, Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 98–5046.

United States Court of Appeals, Federal Circuit.

Oct. 9, 1998.

Steven G. Mahon, Doherty, Rumble & Butler, PA, of St. Paul, MN, argued for plaintiff-appellant. With him on the brief were Sue Ann Nelson and Terrance A. Costello, of Minneapolis, MN.

Gilbert S. Rothenberg, Attorney, Tax Division, U.S. Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Loretta C. Argrett, Assistant Attorney General and Curtis C. Pett, Attorney.

Before MAYER, Chief Judge, RICH and RADER, Circuit Judges.

MAYER, Chief Judge.

Cenex, Inc. appeals the judgment of the United States Court of Federal Claims, No. 92–CV–97, which granted the United States' motion for summary judgment that losses associated with Cenex's investment in Energy Cooperative, Inc. are capital losses and that Cenex's payments to Northern Tier Pipeline Company for shutdown costs were contributions to capital that deserve capital loss treatment. Because the court correctly characterized these losses as capital ones, we affirm.

*Background*

Cenex, Inc. is an agricultural cooperative corporation that sells, *inter alia*, petroleum products to farmers and ranchers. In 1975, in order to obtain an assured supply of refined petroleum products, Cenex and eight other regional cooperatives established a corporation, ultimately named Energy Cooperative, Inc. ("ECI"), to operate an oil refinery. ECI's corporate structure was set up so that

ownership of ECI stock was required to purchase ECI's petroleum products and ECI's output was allocated among its owners based on the number of shares each held. Between 1975 and 1981, Cenex purchased $14,615,701 of ECI preferred stock and $1,000 of common stock, and received "$129,600 of ECI stock as part of its patronage dividend distribution." Each share of stock had a par value of $100.00. The preferred stock had no voting rights and was not entitled to dividends, but had preference over common stock upon liquidation.

ECI did not have a long-term supply of crude oil, its refinery was old and had a limited capacity to produce unleaded products, and its product prices were not competitive. As a result of these handicaps and other factors, ECI filed for bankruptcy under Chapter 11, 11 U.S.C. §§ 1101–1174, in May 1981, but converted this proceeding to a liquidation under Chapter 7, 11 U.S.C. §§ 701–766, in 1984, which rendered its stock worthless. Cenex's 1984 tax return listed a loss of $14,745,301 attributable to its investment in ECI, which it characterized as ordinary under I.R.C. § 165(a). After an audit, the Internal Revenue Service ("IRS") determined that the loss was a capital one, deductible only in accordance with I.R.C. §§ 165(f), 1211(a), and 1212(a). This characterization is significantly less desirable for Cenex because its ordinary losses are deductible from ordinary gain, whereas its capital losses offset only capital gain, which is generally taxed at a lower rate than ordinary gain. See I.R.C. § 1211(a); compare I.R.C. § 1201(a)(2) with § 11(b).

During the audit of Cenex's 1984 return, the IRS also determined that Cenex had mischaracterized a loss stemming from Cenex's ownership in Northern Tier Pipeline Co. ("Northern Tier"), which was established to construct and operate a pipeline from Washington state to Minnesota. Cenex purchased stock in and made loans to Northern Tier in 1979. In 1982, Cenex and the other owners entered into an agreement ("the 1982 Agreement") that modified the terms of previous loan notes issued to Northern Tier and established liability for shutdown costs in the event that the company abandoned its plan to construct the pipeline. In 1983, Northern Tier abandoned the pipeline project and made "cash calls" to its owners to cover the costs of shutting down. In 1983 and 1984, Cenex made shutdown payments to Northern Tier of $75,465 and $184,762, respectively. On its 1983 and 1984 tax returns, Cenex deducted these payments as bad debt, which is deductible as an ordinary loss under I.R.C. § 166(a)(1). The IRS ruled that the shutdown payments were not loans, but capital contributions which give rise to capital losses. See Treas. Reg. § 1.166–1(c) ("A ... contribution to capital shall not be considered a debt for the purposes of section 166.").

Cenex sued for a tax refund resulting from these two losses. In response to the parties' cross motions for summary judgment directed to the interpretation of the relevant provisions of the Internal Revenue Code and the 1982 Agreement, the Court of Federal Claims held that Cenex's stock in ECI was a capital asset and that its shutdown payments to Northern Tier were capital contributions. Cenex appeals.

### Discussion

"Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Barseback Kraft AB v. United States*, 121 F.3d 1475, 1479 (Fed.Cir.1997). In light of the absence of a genuine issue of material fact here, our focus is whether the Court of Federal Claims properly construed provisions of the Internal Revenue Code and the 1982 Agreement. Accordingly, our review is *de novo*. See *id.*; *Gump v. United States*, 86 F.3d 1126, 1127 (Fed.Cir.1996) ("We review the summary judgment of the Court of Federal Claims, as well as its interpretation and application of the governing law, *de novo*.").

### ECI Stock

We first address whether the inventory exception of I.R.C. § 1221(1) applies to Cenex's ownership of ECI stock. Section 1221 defines capital assets as all "property held by the taxpayer (whether or not connected with his trade or business)" except for five types of property enumerated in the section. *Id.*

These five "listed exceptions are exclusive." *Arkansas Best Corp. v. Commissioner,* 485 U.S. 212, 218, 108 S.Ct. 971, 99 L.Ed.2d 183 (1988). The first one includes "stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." I.R.C. § 1221(1). Cenex argues that its ownership of stock in ECI qualifies as "other property of a kind which would be properly included in the inventory of the taxpayer if on hand at the close of the taxable year." Recognizing that its ECI stock is not actually inventory,[1] Cenex argues that it should be considered an inventory substitute because it was purchased in order to obtain a supply of petroleum products, which are actual inventory in its business.

The legislative history of section 1221 sheds no light on the type of property qualifying as "other property of a kind which would be properly included in the inventory of the taxpayer if on hand at the close of the taxable year." The Supreme Court has interpreted this phrase broadly, however, to include substitutes for inventory, such as "hedging transactions that are an integral part of a business' inventory-purchase system." *Arkansas Best,* 485 U.S. at 222, 108 S.Ct. 971. The Court offered no guidance on the kind of business arrangement or asset that qualifies as this type of transaction except that the corn futures in *Corn Products Refining Co. v. Commissioner,* 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955), did so.

In *Corn Products,* the taxpayer was a manufacturer of products made from corn, such as starch, syrup, sugar, feed, and oil. The taxpayer's storage capacity could handle only a three week supply of corn. After experiencing sharp increases in the price of spot corn as a result of droughts, the taxpayer began buying corn futures to stabilize its inventory costs. "At harvest time each year it would buy futures when the price appeared favorable. It would take delivery on such contracts as it found necessary to its manufacturing operations and sell the remainder in early summer if no shortage was imminent. If shortages appeared, however, it sold futures only as it bought spot corn for grinding. In this manner it reached a balanced position with reference to any increase in spot corn prices. It made no effort to protect itself against a decline in prices." *Corn Products,* 350 U.S. at 48–49, 76 S.Ct. 20 (footnote omitted). The taxpayer opted to characterize the gains and losses on its futures transactions as capital ones. "Both the Tax Court and the Court of Appeals found [the taxpayer's] futures transactions to be an integral part of its business designed to protect its manufacturing operations against a price increase in its principal raw material and to assure a ready supply for future manufacturing requirements." *Id.* at 50, 76 S.Ct. 20. Based on this integral relationship between the futures and the taxpayer's manufacturing enterprise, the Treasury's consistent treatment of bona fide hedging transactions as a form of insurance and as ordinary assets, Congress' recognition of an exception for hedging transactions in commodity futures in I.R.C. § 1233(a), and the potential for manipulation of the tax code if sold futures were taxed differently than delivered futures, the Court held that the gains and losses related to the corn futures' sales were ordinary. *See id.* at 50, 53–54, 76 S.Ct. 20.

The Court also reasoned that because "Congress intended that profits and losses

---

1. Although the Code does not define "inventory," the Treasury regulations explain that "inventory should include all finished or partly finished goods and, in the case of raw materials and supplies, only those which have been acquired for sale or which will physically become a part of merchandise intended for sale.... Merchandise should be included in the inventory only if title thereto is vested in the taxpayer." Treas. Reg. § 1.471–1; *see also* Random House Unabridged Dictionary 1003 (2d ed.1993) (defining "inventory" as "merchandise or stock on hand, work in

progress, raw materials, finished goods on hand, etc., made each year by a business concern"). Cenex is not in the business of selling securities. *See, e.g., Marrin v. Commissioner,* 147 F.3d 147, 151 (2d Cir.1998) (securities in the hand of a securities dealer, but not a trader, meet the requirements of § 1221(1)); *Van Suetendael v. Commissioner,* 152 F.2d 654, 654 (2d Cir.1945) (securities "could not be classified as stock in trade or property subject to inventory unless they were held by the taxpayer primarily for sale to customers in the ordinary course of business").

arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss . . . [and section 1221] is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly." *Id.* at 52, 76 S.Ct. 20 (citations omitted). Subsequent cases interpreted this as creating another exception to the definition of capital assets for assets acquired for business rather than investment purposes, even when these assets could not reasonably be considered within the scope of the enumerations of section 1221. *See, e.g., Campbell Taggart, Inc. v. United States,* 744 F.2d 442, 450–51 (5th Cir.1984); *FS Services, Inc. v. United States,* 188 Ct.Cl. 874, 413 F.2d 548, 552–53 (1969); *Booth Newspapers, Inc. v. United States,* 157 Ct.Cl. 886, 303 F.2d 916, 921 (1962).

Finding "no support in the language of § 1221" for this proposition, however, in *Arkansas Best,* 485 U.S. at 216, 219, 108 S.Ct. 971, the Court clarified the statements of *Corn Products.* The taxpayer in *Arkansas Best,* a diversified holding company, had acquired sixty-five percent of a bank's stock as an investment, but when the bank began to fail, purchased additional stock for business purposes: to preserve its business reputation by preventing the bank from failing. The taxpayer ultimately sold the stock for a loss, which the Tax Court characterized as ordinary. Applying the post-*Corn Products* cases, the Tax Court concluded that the stock met the judicially-created exception to the definition of capital asset because it was purchased and held for business instead of investment purposes. The Eighth Circuit reversed because the stock fell within the definition of capital asset in section 1221 and did not meet any of the statutory exceptions. The Eighth Circuit also rejected the judicially-created business motive exception on which the taxpayer relied.

The Supreme Court affirmed, explaining that the judicially-created exception was at odds with section 1221's parenthetical phrase, "whether or not connected with his trade or business," and the listed exceptions. *Id.* at 217–18, 108 S.Ct. 971. Furthermore,

the business motive test "is subject to the same kind of abuse that the Court condemned in *Corn Products*" because "if capital stock purchased and held for a business purpose is an ordinary asset, whereas the same stock purchased and held with an investment motive is a capital asset, a taxpayer . . . could have significant influence over whether the asset would receive capital or ordinary treatment." *Id.* at 222, 108 S.Ct. 971. Examining *Corn Products,* the Court explained that it "is properly interpreted as involving an application of § 1221's inventory exception" instead of creating a separate business motive exception. *Id.* at 220, 108 S.Ct. 971. The Court emphasized, moreover, that the corn futures in that case qualified as ordinary assets because they could be considered "surrogates" or "substitutes" for actual inventory. "The close connection between the futures transactions and the taxpayer's business in *Corn Products* was crucial to whether the corn futures could be considered surrogates for the stored inventory of raw corn. For if the futures dealings were not part of the company's inventory-purchase system, and instead amounted simply to speculation in corn futures, *they could not be considered substitutes for the company's corn inventory, and would fall outside even a broad reading of the inventory exclusion."* *Id.* at 221–22, 108 S.Ct. 971 (emphasis added). It follows, therefore, that surrogates or substitutes for inventory must bear a close relationship to actual inventory and can do so if they are closely related to the taxpayer's inventory-purchase system.

Cenex argues that the Court did not overrule or even address the source of supply cases, such as *Booth Newspapers,* 157 Ct.Cl. 886, 303 F.2d 916, and *FS Services,* 188 Ct.Cl. 874, 413 F.2d 548, which interpret section 1221 as requiring the IRS to treat a company's ownership of stock in a supplier of inventory or raw materials as an ordinary asset. Examination of those cases shows, however, that they rely on the rejected, judicially-created business motives exception and do not analyze the stock transactions under the inventory exception. Accordingly, they do not bind us on the issue at hand. Moreover, we believe the source of supply doctrine is incompatible with *Arkansas Best.*

The corn futures in *Corn Products* were closely related to both actual inventory and the inventory-purchase system because they were redeemable for corn, and the taxpayer accepted delivery of corn as needed. Furthermore, the cost of the taxpayer's inventory was directly related to the cost of the corn futures and the gains and losses that the taxpayer experienced in the futures market were the same as they would have been if it had stored corn in a silo. A close relationship between the cost of the inventory and the cost of the hedging transaction ensures that the deduction produced by losses in the hedging transaction offsets the income generated by selling inventory.

■ The ECI stock transaction, in contrast, is not closely related to Cenex's inventory-purchase system and cannot fairly be considered an inventory surrogate. Although stock ownership is required to purchase petroleum products, Cenex cannot redeem the stock for inventory. And, because the value of the ECI stock bears little or no relation to the value of the petroleum products, Cenex's loss is not related to the cost of its inventory. The stock transaction's relationship to Cenex's inventory-purchase system is also insufficient to invoke the inventory substitute exception because it neither meets the Treasury regulation's definition of hedging transaction, which requires a reduction in the risk of price changes,[2] nor serves the same hedging function as the corn futures in *Corn Products*. Although the corn futures did not protect against all price fluctuations, they protected against price increases, about which the taxpayer was most concerned, and secured a specific quantity of corn. Cenex's stock ownership, on the other hand, did not guarantee it a price for or quantity of petroleum products. Because ECI did not have a long-term supply of crude oil, its costs to produce petroleum products depended on the market price of crude oil, which left Cenex vulnerable to increases in the price of petroleum products

it bought from ECI. ECI's lack of an assured supply of crude oil also prevented it from guaranteeing an output sufficient to meet Cenex's needs. Thus, Cenex's ownership in ECI did not completely insulate it from the risk of having to purchase petroleum products on the open market.

The ECI stock transaction is more akin to vertical integration than it is to an inventory substitute. If Cenex were to produce petroleum products itself, it would not be able to classify its refinery operation as inventory; once petroleum products were produced, they would be considered inventory and other assets would have to meet the requirements of section 1221 to escape classification as capital assets. Allowing Cenex to declare its refinery operation an ordinary asset simply because it owns stock would circumvent Congress' intent in creating only the five exclusions of section 1221. Perhaps excluding stock of an inventory supplier from the definition of "capital asset" is good policy, but we prefer to leave this decision to Congress.

*Payments to Northern Tier*

■ Bona fide, wholly worthless debts are deductible from ordinary income. *See* I.R.C. § 166(a)(1). "A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Treas. Reg. § 1.166–1(c). Contributions to capital do not qualify as bona fide debt. *See id.* Courts have developed a variety of factors to discern bona fide debt from capital contributions. *See Adelson v. United States*, 737 F.2d 1569, 1571 (Fed.Cir.1984). These include, for example,

(1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the

---

2. A hedging transaction is "a transaction that a taxpayer enters into in the normal course of the taxpayer's trade or business primarily—(1) [t]o reduce risk of price changes or currency fluctuations with respect to ordinary property ... that is held or to be held by the taxpayer; or (2)[t]o reduce the risk of interest rate or price changes or currency fluctuations with respect to borrowings made or to be made, or ordinary obligations incurred or to be incurred, by the taxpayer." Treas. Reg. § 1.1221–2.

source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.

*Roth Steel Tube Co. v. Commissioner*, 800 F.2d 625, 630 (6th Cir.1986); *see also Adelson*, 737 F.2d at 1572; *Bordo Products Co. v. United States*, 201 Ct.Cl. 482, 476 F.2d 1312, 1321–25 (1973); *Cuyuna Realty Co. v. United States*, 180 Ct.Cl. 879, 382 F.2d 298, 302 (1967); *American Processing & Sales Co. v. United States*, 178 Ct.Cl. 353, 371 F.2d 842, 848 (1967). The "balancing of the relevant factors depends upon the unique circumstances of each case." *Adelson*, 737 F.2d at 1572.

■ The trial court found that the language of the 1982 Agreement, which established Cenex's obligation to pay shutdown costs, did not show that the transaction had traditional indicia of bona fide debt. Paragraphs 4 and 5 of the Agreement discuss the shutdown cost obligations. Paragraph 4 reads, "In the event all of the activities on the Pipeline Project are terminated, each party hereto, exclusive of Western, agrees to pay its pro rata share of the initial $750,000 of shutdown costs." Paragraph 5 states that Cenex and some of the other owners "each agrees to pay its pro rata share of any shutdown costs in excess of the initial $750,-000 and to limit [other owners'] obligation for shutdown costs to the initial $750,000 as set forth in paragraph 4." The owners' pro rata shares are proportional to their ownership of stock, which suggests that the payments were contributions to capital. *See Bordo*, 476 F.2d at 1324 ("Proportional holdings of debt and stock have always been considered as indicative of equity rather than debt."). Neither paragraph expressly creates an obligation for Northern Tier to repay the money contributed for shutdown costs. Furthermore, such an obligation is contrary to the purpose of the funds. Because shutdown costs arise in the course of ceasing business operations, the owners could not reasonably have expected Northern Tier to repay them.

Also absent from these paragraphs are two key, traditional indicia of debt—a repayment schedule and an interest rate. *See Bordo*, 476 F.2d at 1321–22 ("Classic definitions of debt emphasize the necessity for a fixed or determinable time when the debtor can be unconditionally required to make repayment.... Absent countervailing considerations, the failure to charge a rate of interest commensurate with the risk undertaken points to the conclusion that a capital contribution is involved."). Cenex argues that Paragraph 1 provides interest and repayment terms for all money advanced to Northern Tier. This paragraph amends "[t]he Credit Agreements, any amendments thereto and each of the Notes," to provide that interest is "compounded semi-annually on the first days of January and July each year *at the rates set forth for each individual note.*" (emphasis added). In addition, it states that the interest and principal are due "on the earlier of the date Northern Tier commences construction of the Pipeline Project or the Pipeline Project is terminated whereupon all such amounts will become immediately due and payable."

This language does not provide an interest rate independent of the ones provided by the Notes. Because Paragraphs 4 and 5 similarly fail to provide an interest rate, the transaction is missing this indicium of a creditor-debtor relationship. More damaging to Cenex's position, however, is the provision that accelerates all loans when the pipeline project is terminated. Cenex argues that this provision provides the indicium of a repayment schedule. However, because the shutdown payment obligations do not arise until termination, interpreting Paragraph 1 to provide a repayment schedule for the shutdown payments yields an absurd result—it would require Northern Tier to repay the money earmarked for shutdown costs immediately upon receiving it. As a result, the 1982 Agreement has no repayment schedule.

*Conclusion*

Accordingly, the judgment of the Court of Federal Claims is affirmed.

*AFFIRMED.*